PENNSYLVANIA WATER & POWER CO. ET AL. *v.*
FEDERAL POWER COMMISSION ET AL.

NO. 428.

Argued April 3–4, 1952.—Decided May 26, 1952.

*Wilkie Bushby* argued the cause for the Pennsylvania Water & Power Co. et al., petitioners in No. 428. With him on the brief were *Randall J. LeBoeuf, Jr., James Piper* and *Raymond Sparks*.

*William J. Grove* argued the cause for the Pennsylvania Public Utility Commission, petitioner in No. 429. With him on the brief was *Thomas M. Kerrigan*.

*Solicitor General Perlman* argued the cause for the Federal Power Commission. With him on the brief were *Assistant Attorney General Baldridge, Robert L. Stern, Paul A. Sweeney, Melvin Richter, Bradford Ross, Howard E. Wahrenbrock, Reuben Goldberg* and *Theodore French*.

*Alfred P. Ramsey* argued the cause for the Consolidated Gas Electric Light & Power Co., respondent in No. 428. With him on the brief was *G. Kenneth Reiblich.*

*Charles D. Harris* argued the cause and filed a brief for the Public Service Commission of Maryland, respondent in No. 428.

MR. JUSTICE BLACK delivered the opinion of the Court.

In 1944 the Maryland Public Service Commission, the Mayor and Council of the City of Baltimore, the Baltimore County Commissioners, and several private purchasers of electric power decided to ask the Federal Power Commission for help. They requested the Commission to investigate allegedly "excessive rates" the Pennsylvania Water & Power Company (Penn Water) [1] was charging Consolidated Gas Electric Light and Power Company of Baltimore (Consolidated). The Maryland interests wanted the Federal Power Commission to reduce these charges so that the state commission could lower Consolidated's rates to its Maryland customers. The federal Commission held many months of extensive hearings and found that Penn Water had charged its customers almost three times what it should have in 1946. In that year it had a net operating income of $3,477,408, as contrasted with $1,300,672 which the Commission found would have been a fair return (5¼%) on a fair rate base ($24,774,-712), allowing Penn Water "about 8.64% for common stock and surplus, which is adequate." [2] The Commis-

---

[1] Penn Water, as used in this opinion, refers to both Pennsylvania Water & Power Company and its wholly owned affiliate, Susquehanna Transmission Company of Maryland.

[2] There was evidence before the Commission that from 1936 through 1945 Penn Water's dividends on its common stock had never been less than 25% of the cash paid in on the stock.

sion ordered Penn Water to file a new schedule of rates and charges to bring about the reductions required.

In subsequent orders the Commission denied Penn Water's applications for rehearing, rejected as insufficient new rate schedules filed by Penn Water, and itself prescribed the rate schedules which Penn Water here seeks to avoid. On review the Court of Appeals gave full consideration to Penn Water's multitudinous challenges and approved the Commission's action, one Judge dissenting. 89 U. S. App. D. C. 235, 193 F. 2d 230.

Most of the numerous questions presented and decided by the Commission and the Court of Appeals are not presented here by the petitions for certiorari which we granted.[3] We are not called on to review the adequacy of the evidence to support the Commission's findings as to a fair rate base, a fair rate of return, or any other findings except insofar as our decision of several rather general questions presented might indirectly undermine some of them. The questions we must decide are in general these:

(1) Does the fact that Penn Water is a licensee under Part I of the Federal Power Act,[4] and therefore subject to regulation under that Part, preclude its regulation under Part II of the Act as a public utility engaged in interstate commerce?

(2) Assuming that Penn Water can be subjected to regulation under both Parts of the Act, were the Commission and the Court of Appeals correct in holding that all of Penn Water's sales at wholesale were "in interstate commerce" within the meaning of Part II of the Act?

(3) Does the Commission's rate reduction action compel the continuance of or is it improperly based

---

[3] 342 U. S. 931.
[4] 41 Stat. 1063, 49 Stat. 838, 16 U. S. C. § 791a et seq.

upon contractual agreements between Penn Water and Consolidated which Penn Water cannot carry out without violating the federal antitrust laws or the laws of Pennsylvania forbidding surrender by Pennsylvania corporations of their corporate independence?

## I.

Although Penn Water is the type of "public utility" subject to regulation under Part II of the Act, it argues that since it is subject to regulation under Part I as a licensee, it cannot be regulated under Part II as a public utility. We cannot agree. With some express exceptions not here relevant, the language of Part II of the Act makes all "public utilities" subject to the regulation it prescribes. No reason has been advanced which could possibly justify a judicial exception to this statutory command. A major purpose of the whole Act is to protect power consumers against excessive prices.[5] Part I leaves regulation to the states under some circumstances. But, under § 20 of Part I the Federal Government is to protect the consumer if a state regulatory body does not exist or the "States are unable to agree . . . on the services to be rendered or on the rates or charges of payment therefor . . . ." Part II proceeds on the assumption that regulation of public utilities transmitting and selling power at wholesale in interstate commerce is a matter which must be accomplished by the Federal Government. Part II therefore provides for a more expansive federal regulation than that authorized under Part I. It would hinder, not help, the Power Act's program if

---

[5] Section 20 of Part I provides that "the rates charged and the service rendered . . . shall be reasonable, nondiscriminatory, and just to the customer . . . ." Section 205 (a) of Part II provides that "All rates and charges . . . shall be just and reasonable . . . ."

we should impliedly exempt Part I licensees from the more expansive Part II regulation. It may be possible that some future cases will develop minor inconsistencies in the administration of the two Parts. Today's case, however, is not such a one. We hold that Penn Water is subject to regulation under Part II of the Act. It is also subject to Part I regulation since the Commission found on substantial evidence, as the court below held, that the States were "unable to agree" within the meaning of § 20 of Part I of the Act.

## II.

It is contended that some of Penn Water's sales at wholesale were not "in interstate commerce" and therefore were not subject to federal regulation under Part II. This contention refers to sales made by Penn Water in Pennsylvania to Pennsylvania customers. These are alleged to include about 83% of Pennsylvania generated power. Because of the following circumstances we agree with the Commission and the Court of Appeals that these sales were "in interstate commerce."

Penn Water and Safe Harbor Water Power Corporation (Safe Harbor) have hydroelectric plants on the Susquehanna River in Pennsylvania. Consolidated operates large steam-generating plants in Baltimore. The flow of the Susquehanna varies greatly even from day to day. During periods of low flow, Penn Water receives steam-generated energy from Baltimore in order to meet its power supply commitments. Conversely, during periods of high flow, Consolidated is able to receive the cheaper hydroelectric power from Penn Water and Safe Harbor. For many years Penn Water, Consolidated, and Safe Harbor have been operating under contracts for the coordinated sale and distribution of electric power in Maryland and Pennsylvania. A complete integration

and pooling of the power producing and transmitting facilities of the three companies was thus achieved. With reference to this coordinated system of production and distribution, the Commission said:

"The central fact disclosed by the record about Penn Water's sales in Pennsylvania is that they are not sales of the output of Penn Water's own plant, but sales of output of the integrated and coordinated interstate electric system of which Penn Water's facilities are an integral part. . . .

"In this manner energy crossing the State boundary, with other system energy, is used to fulfill system requirements. There result times when system energy generated in Pennsylvania is used, mixed or unmixed, in meeting system requirements in Maryland. Similarly, there are occasions when system energy from Maryland is used, mixed or unmixed, in meeting system requirements in Pennsylvania. Energy flows in, across, and out of the system transmission network as the needs of the interconnected members develop from minute to minute and day to day.

"It is accordingly evident that the operations of the unified system enterprise are completely interstate in character, notwithstanding the fact that system energy transactions at some particular times may involve energy never crossing the State boundary." 8 F. P. C. 1, 12, 15.

We hold that the Federal Power Commission has complete authority to regulate all of this commingled power flow.[6] The Commission's power does not vary with the rise and fall of the Susquehanna River.

---

[6] See also *Safe Harbor Water Power Corp.* v. *Federal Power Commission,* 179 F. 2d 179, affirming 5 F. P. C. 221.

## III.

Penn Water contends that the Commission's orders improperly require it to continue performing an illegal contract and that continued performance of this contract is the basis for some of the Commission's findings. This contract allegedly requires Penn Water to subject the management of its business affairs to the domination of Consolidated and for this reason violates the federal antitrust laws and the corporation laws of Pennsylvania under which Penn Water is incorporated. In private litigation, the Court of Appeals for the Fourth Circuit has agreed with Penn Water that certain provisions of the contract are illegal for the reasons stated. Viewing these provisions as inseparable, that court held the entire contract unenforceable.[7]

We need not now decide the question much argued here concerning what, if any, power the Commission has to rely on or to compel parties to carry out private contracts which would otherwise be illegal; the Commission has not attempted to exercise such power in this case. It is true that Penn Water must continue to do some of the things it used to do in compliance with the Penn Water-Consolidated contract. For under the present schedules prescribed by the Commission's order Penn Water must continue to buy, sell, and transmit power in the same coordinated manner in which it and Consolidated have been functioning for more than twenty years. But the Commission's order, as construed by the Commission, by the Court of Appeals and by us, neither expressly nor impliedly requires Penn Water to yield to any contractual terms subjecting it to the control of Consolidated. In the highly unlikely event that Penn Water's man-

---

[7] *Pennsylvania W. & P. Co.* v. *Consolidated Gas, E. L. & P. Co.,* 184 F. 2d 552. See also *Consolidated Gas, E. L. & P. Co.* v. *Pennsylvania W. & P. Co.,* 194 F. 2d 89.

agerial freedom is ever threatened by such an order, it
will be time enough to consider its validity.  To the ex-
tent that Penn Water is being controlled, it is by the Com-
mission, acting under statutory authority, not by Con-
solidated, acting under the authority of private contract
terms "legalized" by the Commission.  The duty of Penn
Water to continue its coordinated operations with Con-
solidated springs from the Commission's authority, not
from the law of private contracts.

Nor has the Commission premised any of its findings
upon the assumed existence and continuation of this con-
tract.  Penn Water first made this contention to the
Commission in seeking a rehearing of the Commission's
order directing a reduction in its rates.  At that time the
Commission fully re-examined its former opinion, find-
ings and orders, modified some and reaffirmed and
strengthened others, and expressly stated that the valid-
ity of its order was not dependent upon the legality of
the contract.  It said: "If there are questions as to legal-
ity of the foundation contracts which are in litigation,
as respondents' application for rehearing indicates, the
validity of our order is not dependent upon the decision
of those questions."  8 F. P. C. 170, 175.  We agree with
the Court of Appeals that neither the order nor the find-
ings were premised on the continuation of the Penn
Water-Consolidated contract.

The Act gives the Commission ample statutory power
to order Penn Water and Consolidated to continue their
long-existing operational "practice" of integrating their
power output.  Section 206 provides that "Whenever the
Commission, after a hearing . . . shall find that any
rate . . . is unjust, unreasonable . . . the Commission
shall determine the just and reasonable rate, . . . prac-
tice, or contract to be thereafter observed and in force,
and shall fix the same by order."  In ordering such "prac-
tice" continued, the Commission was furthering the ex-

pressly declared policy of the Act. Moreover, the Commission found here ready-made by prior contractual arrangements a regional coordination of power facilities of precisely the type which the Commission is authorized to require under § 202. Section 202 (a) declares:.

> "For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, . . . ."

The Commission was further directed in that section to "promote and encourage" such interconnection and coordination. Under certain circumstances § 202 (b) authorizes the Commission to compel interconnection and coordination in the public interest, and to "prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them."

If Penn Water wishes to discontinue some or all of the services it has rendered for the past twenty years, the Act, as the Commission pointed out, opens up a way provided Penn Water can prove that its wishes are consistent with the public interest. Shortly after Part II of the Power Act was passed in 1935, Penn Water, as required by § 205 (c), filed with the Commission the contract here attacked and then designated by the Commission as "Penn Water's Federal Power Commission Rate Schedule No. 1." Section 205 (d) provides that "no change shall be made by any public utility in any such . . . serv-

ice . . . or contract relating thereto, except after thirty days' notice to the Commission and to the public." Here instead of following the procedure for changing existing services and practices—a procedure which the Congress has authorized and which the Commission has supplemented by rules of its own—the company has rather tried to utilize a violation of the Sherman Act so as to nullify a rate-reduction order.

Nothing whatever has been presented by Penn Water to show that the end result of this rate reduction is unjust or unreasonable. Cf. *Power Comm'n* v. *Hope Gas Co.,* 320 U. S. 591, 603.

*Affirmed.*

Mr. JUSTICE FRANKFURTER, not having heard the argument, owing to illness, took no part in the disposition of these cases.

Mr. JUSTICE DOUGLAS, with whom Mr. JUSTICE REED concurs, dissenting.

There is more to these cases than meets the eye. On the surface they seem to be only an illustration of the exploitation of the public by a utility through the charging of excessive rates. But far greater issues lurk in the record. There is lawless conduct that overshadows the evils of extortionate rates. It is lawless conduct that violates the Sherman Act. It implicates not only the utilities but the regulatory agency as well. The desire to reduce excessive rates should not blind us to the greater evil. It is far better that one public utility win one more legal skirmish in its struggle against regulation, than that we abandon legal standards and let the regulatory agency run riot.

We start here with the exploitation of the public through an unholy alliance between two public utility companies—Penn Water and Consolidated. That alli-

ance has been condemned by the Court of Appeals for the Fourth Circuit. See 184 F. 2d 552; 194 F. 2d 89. The alliance was illegal because it violated the Sherman Act. It was an arrangement that permitted Penn Water to be operated as though it were a department of Consolidated. All competition between the two companies was destroyed, as evidenced by the fact that in 1948 Consolidated vetoed a steam electric generating plant to be built by Penn Water at Holtwood, Pennsylvania. What Penn Water may do, the revenues it receives, the costs it will incur are largely determined by Consolidated under these illegal contracts.

The Commission in its opinion on rehearing said, "If there are questions as to the legality of the foundation contracts which are in litigation, as respondents' application for rehearing indicates, the validity of our order is not dependent upon the decision of those questions. In our opinion and order we took care to leave the continuation of the operation of the integrated and interconnected system *in full effect,* merely changing the rates, . . . ." (Italics added.) 8 F. P. C. 170, 175. The Commission has accordingly approved the unholy alliance. It has allowed Consolidated to continue to manage Penn Water as though the latter were its *alter ego*. It is therefore disingenuous for the Court to say that hereafter Penn Water is subject to control by the Commission, not by Consolidated, and that the Commission did not premise any of its findings on the assumed existence and continuation of the illegal contracts.* No matter how vehement our denial, the truth is that the Commission has laced Penn Water to Consolidated under a manage-

---

*The Commission entered its final order in the cases prior to the decision of the Court of Appeals in the Sherman Act litigation. The Commission opinion on rehearing was dated February 26, 1949, while the first decision of the Court of Appeals was on September 30, 1950.

426

ment contract that leaves Penn Water no initiative of private management.

Of course the Commission has authority under § 202 of the Federal Power Act to promote and at times compel interconnection and coordination of the facilities of public utility companies. But I know of no power in the Commission that authorizes it to place one company on the back of another company, to merge and consolidate companies as it chooses, or to give the management of one company a veto power over the management of a competitor. Those are practices which the Sherman Act condemns, and which nothing in the Federal Power Act sanctions.

These cases should be reversed and remanded to the Commission with directions that the Commission build its rate order on the powers that it has under the Federal Power Act, not on the unholy alliance that these utilities created and that the Commission has sought to perpetuate.