**ARKANSAS POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 18262.

United States Court of Appeals Eighth Circuit.

Nov. 7, 1966.

Richard M. Merriman, Reid & Priest, Washington, D. C., for petitioner. Harry A. Poth, Jr., and Peyton G. Bowman, III, of Reid & Priest, Washington, D. C., and New York City, were with him on the brief, and also Edward B. Dillon, Jr., of House, Holmes & Jewell, Little Rock, Ark.

Israel Convisser, Atty., F. P. C., Washington, D. C., for respondent. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., and Drexel D. Journey and Wallace E. Brand, Attys., F. P. C., Washington, D. C., were with him on the brief.

Before VOGEL, Chief Judge, MATTHES, Circuit Judge and DUNCAN, District Judge.

MATTHES, Circuit Judge.

In this proceeding petitioner, Arkansas Power & Light Company, (hereinafter Arkansas) seeks to review orders of the Federal Power Commission determining that Arkansas' sales of electric energy for resale to its municipal and cooperative customers are sales in interstate commerce within the meaning of Sections 201, 205 and 206 of the Federal Power Act, 49 Stat. 847, 851, 852 (1935), 16 U.S.C. §§ 824, 824d, 824e (1960). The sales at issue in this jurisdictional proceeding represent sales to twenty-three

purchasers at 108 separate delivery points.[1]

## I.

■ Arkansas is one of four utility operating companies which form part of the Middle South System (Middle South) of electric utilities, an integrated, interconnected group of utilities having a network of more than 5,000 miles of high voltage transmission lines throughout the states of Arkansas, Mississippi and Louisiana.[2] In addition to an extensive network of transmission facilities, these companies generate the bulk of their own electric energy from eighteen steam and hydroelectric power plants within this three state area. Transmission and generation functions are so coordinated and integrated as to permit an instantaneous transfer of electrical power to any part of Middle South's transmission network. The Middle South System in turn is interconnected with other major power systems in the eastern part of the United States and forms part of a network known as the "Interconnected Systems Group." This combine of the Interconnected Systems Group with other interconnected power systems, known as CANUSE and PJM,[3] covers the entire eastern half of the United States and represents about 140 electric utilities, of which petitioner Arkansas is one.

Each of Middle South's subsidiaries operates its generators synchronously at a 60-cycle frequency, a function known as load frequency control. Frequency control is a critical requirement for the effective operation of interconnected utilities. The Middle South System, as well as other power systems in the "interconnected Systems Group," operates on a form of automatic control called "Tie Line Bias" which makes each system contribute its assistance in maintaining the standard 60-cycle frequency. If the generating frequency falls below 60-cycles per second, this would mean that the load or electrical consumption on a particular interconnected system has increased, or that generation has decreased. Conversely, if the frequency rises, electrical consumption has decreased in relation to generation. The Middle South System as part of its obligation must provide sufficient generating capacity to avoid imposing the burden of regulating frequency on other systems.

The combined service areas of the Middle South subsidiaries form what is known as a "control area."[4] The control operator has a choice in the selection of generators in this control area to meet area power requirements. His selection is based upon the necessity of fulfilling combined system requirements at the least possible cost. Ordinarily the control operator employs the generating sources in the Middle South System to supply its own requirements. However, where there is a shortage of generation in the Middle South System, electric energy from outside the control area automatically moves in to supply the deficiency, a process referred to as "pool assist."

Moreover, various other factors such as fuel costs, transmission losses, and generator performance may make it economically feasible to draw desired energy from other systems rather than from Middle South's own generation facilities. When

1. Petitioner—Arkansas is admittedly a "public utility" within the meaning of Section 201(e) 49 Stat. 847 (1935), 16 U.S.C. § 824(e) (1960), of the Federal Power Act and therefore the Commission will have exclusive regulatory jurisdiction over all of Arkansas' sales in interstate commerce.

2. The other operating subsidiaries of the Middle South System are Louisiana Power & Light Company, Mississippi Power & Light Company and New Orleans Public Service, Inc.

3. Canada-United States Eastern Connection and Penn-New Jersey-Maryland Interconnection.

4. A "control area" may comprise a single utility, or a group of several utilities in an interconnected system. Each control area is expected to adjust its generation to follow the fluctuation of the load and do its share of system frequency control.

such is the case, the control operator arranges interchange transactions with another system. Even where no pool assist or interchange is necessary, electric energy may flow unscheduled over the boundary ties [5] of the Middle South System.

The following finding of the Commission summarizes its findings in regard to the delivery of interstate energy to the wholesale customers.

"As a consequence of this method of operation, Respondent [Arkansas] receives and delivers energy across state boundaries pursuant to rate schedules on file with the Commission. In 1963 Respondent received 1,062,818,000 kwh of electric energy from Louisiana Power and Mississippi Power within the control area and from Oklahoma Gas & Electric Company and Empire District Electric Company outside the control area. In the same year total deliveries to those systems were 766,462,000 kwh.

"The sales to the 23 customers involved in these proceedings are made from short lines extending from substations where the voltage is stepped down in most instances from 115 kv to 13.8 kv for delivery to each customer. Total deliveries to these customers amounted to 718,768,360 kwh in 1963. The sales to the 23 customers are made from energy available in Middle South's control area which extends over three states and from energy received from other systems outside the control area. As in Indiana & Michigan, supra, we are not dealing merely with a single flow of energy or multiple flows of energy but are dealing instead with an interstate pool of energy to which the generators of the control area and other interconnected systems contribute power and from which all loads, and sometimes the loads of other systems, are supplied. * * *" 34 F.P.C. at ——.

■ The basic question for our determination is whether the Commission's finding that all of the twenty-three wholesale purchasers received interstate energy is supported by substantial evidence. Arkansas readily concedes that "some of the 108 sales involve from time to time interstate energy." Indeed, the tracing studies conducted by Arkansas and introduced at the hearing before the Commission show that at least sixteen out of twenty-three resale customers received energy from outside Arkansas during one of the study periods. Thus, in brief, Arkansas' position is that absent evidence of a study by the Commission based on the manual or computer tracing technique (concededly not made), there is no factual basis to support the Commission's finding. The Commission with candor acknowledges "that in past cases tracing studies * * * were put in evidence to show that out-of-state energy was delivered to specified customers." The Commission asserts, however, that the teachings of the Supreme Court clearly establish that where, as here, there is an integrated, interstate pool operation, jurisdiction may be proved without resort to tracing studies. We agree with the Commission and affirm.

We are not prepared to say that detailed tracing studies are a sine qua non to the conferral of federal jurisdiction where there exists an integrated, interstate "pool assist" operation as in the present case.

■ While the Supreme Court has reiterated that "federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test", we do not construe this language as requiring the employment of tracing studies in every instance. While this standard was applied in Federal Power Commission v. Southern California Edison Co., (The *Colton* case) 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), it seems clear that the Supreme Court there was not confronted with the highly integrated, interconnected pool operation that characterizes the Middle South System. In the *Colton* case, the issue centered on whether

---

5. Boundary ties are tie lines that connect one control area to another and define the geographical extent of a particular area.

out-of-state energy was delivered by Southern California Edison Co. to a single customer, the City of Colton. Since no integrated operation was present in that case, the Commission by necessity had to resort to scientific studies to show that out-of-state energy reached the sales to the City of Colton. Similarly in Connecticut Light & Power Co. v. Federal Power Commission, 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150 (1945), the Connecticut Light & Power Co. attempted to disavow all affiliation with the Connecticut Valley Power Exchange, and interstate power pool and rearrange "its operations with intent to cut every connection and discontinue every facility whose continued operation would render it subject to the Federal Power Commission's control." The Commission then attempted to invoke its jurisdiction upon a single remaining facility of the company. In such an instance only scientific and engineering data could substantiate the Commission's determination of jurisdiction over one facility, which otherwise retained the appearance of a local and intrastate service.

Moreover, we feel that the limited tracing studies offered by Arkansas convincingly demonstrates the existence of extensive amounts of interstate energy in each of the sales to its twenty-three customers, proof of which Arkansas contends does not exist. It stands undisputed in the record that Petitioner's tracing studies, while encompassing only four hours out of an annual total of 8,760 hours, showed that out-of-state energy reached at least sixteen (or perhaps nineteen based upon the government interpretation) customers of Arkansas. We agree with the Commission that it seems highly probable that during the remaining unchecked period of 8,756 hours, some interstate energy did in fact reach each of Petitioner's twenty-three wholesale customers. To hold otherwise, we feel would ignore the patent realities of Arkansas' integrated operations.

In Connecticut Light & Power Co. v. Federal Power Commission, supra, the crucial question was whether the company was a "public utility" by reason of its ownership of facilities which were not used in local distribution. As previously indicated, the company for some time prior to August 26, 1935 [6] operated as a member of the Connecticut Valley Power Exchange, an interstate power pool which interchanged energy among certain systems in New York, Massachusetts and Connecticut. Just prior to the effective date of the Act and for the purpose of avoiding regulation by the Commission, the company severed all operations which it believed would render it subject to the Commission's jurisdiction. Pertinent here is the Court's observation that:

"had such operation [interchange of energy from the power pool] continued, the Company would be subject to the Act and to the Commission's order." 324 U.S. at 518, 65 S.Ct. at 751.

Pennsylvania Water & Power Co. v. Federal Power Commission, 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042 (1952) similarly supports the Commission's position in the instant case. There, as in our case, the company contended that some of its sales at wholesale were not in interstate commerce and therefore not subject to federal regulation. Although the company's sales to its Pennsylvania customers involved almost 83% Pennsylvania generated power, the record conclusively showed that with the ebb of the Susquehanna River Pennsylvania Water & Power Company (Penn Water) received steam-generated energy from Baltimore, Maryland in order to meet its power supply commitments; conversely, with the high flow of the river, Consolidated Gas Electric Light and Power Company of Baltimore (one of Penn Water's customers) was able to receive cheaper hydroelectric power from Penn Water and Safe Harbor Water Corporation. Each of these three companies operated under contracts for the coordinated sale and distribution of electric power in Maryland

---

6. The effective date of the Federal Power Act.

and Pennsylvania. In the words of the Supreme Court the result was:

> "a complete integration and pooling of the power producing and transmitting facilities of the three companies * * *." 343 U.S. at 420, 72 S.Ct. at 846.

Contrary to the company's contention the Commission found:

> "The central fact disclosed by the record about Penn Water's sales in Pennsylvania is that they are not sales of the output of Penn Water's own plant, but sales of output of the integrated and coordinated interstate electric system of which Penn Water's facilities are an integral part. * * * *"

> *       *       *       *       *       *

> " * * * Energy flows in, across and out of the system transmission network as the needs of the interconnected members develop from minute to minute and day to day.

> "It is accordingly evident that the operations of the unified system enterprise are completely interstate in character, notwithstanding the fact that system energy transactions at some particular times may involve energy never crossing the State boundary." 8 F.P.C. at 12, 15.

The Supreme Court in affirming the Commission stated:

> "We hold that the Federal Power Commission has complete authority to regulate all of this commingled power flow. The Commission's power does not vary with the rise and fall of the Susquehanna River." 343 U.S. at 420, 72 S.Ct. at 846.

People of State of California v. LoVaca Gathering Co., 379 U.S. 366, 85 S. Ct. 486, 13 L.Ed.2d 357 (1965), though dealing with the flow of natural gas, nevertheless seems to lend credence to the Commission's position. In that case the Supreme Court reiterated its holding in the natural gas cases that once it is determined that gas crosses a state line at any stage of its movement towards the ultimate consumer and is intended to be resold, federal jurisdiction is invoked at the outset of the entire transaction.

In Wisconsin-Michigan Power Co. v. Federal Power Commission, 197 F.2d 472 (7th Cir.1952), cert. denied, 345 U.S. 934, 73 S.Ct. 794, 97 L.Ed. 1362 (1953), the Seventh Circuit in affirming the Commission relied upon the basic nature of the interstate transfers of energy. The integrated operations of the *Wisconsin-Michigan Power Co.* bore a striking resemblance to those in the instant case. Its twelve steam and hydroelectric plants and one diesel plant located throughout the states of Wisconsin and Michigan were interconnected and coordinated to provide the maximum amount of voltage at the least possible cost. Thus, where a Michigan plant's production fell below a certain level, it was supplemented by Wisconsin generated energy transmitted over the interconnecting line. The converse was similarly true as to the importation of Michigan generated electric energy. From a review of these operations, the court found "the essential fact in this respect is that, in this coordinated operation, electric energy is transmitted from Michigan to Wisconsin and from Wisconsin to Michigan in appreciable amounts by the power company and by it commingled with energy generated in the two respective districts and then delivered to the customers here involved." 197 F.2d at 474.

We do not detect any valid distinguishing feature between Indiana & Michigan Electric Company v. Federal Power Commission, 365 F.2d 180 (7th Cir.1966), and the facts relied upon to establish jurisdiction over the sales in issue here. In *Indiana & Michigan,* as is true in our case, the petitioner insisted that in order to invoke jurisdiction the Commission was required to prove by substantial scientific and engineering evidence that out-of-state energy flows to each sale in issue and that these sales are not made over facilities used in local distribution. In deciding the jurisdictional question the court stated:

> "We think the proof before the Commission was sufficient to show that

out-of-state energy reached all of the wholesale customers. True, point to point tracing was impossible. This kind of tracing requires automatic recording meters at various points on the system and I&M does not need and does not have such meters. Hence, I&M insists that this kind of proof is not possible on their system, and that no other kind or type of proof can be sufficient."

"We think the Commission was justified in holding that the important consideration in determining jurisdiction here is the integrated interstate pool character of the operation. * * *

"The unpredictable and free-flow of energy in the System in response to any number of constantly changing occurrences, makes it certain, in the view of the Federal Power Commission that out-of-state energy received by I&M at a number of points at or near its eastern, southern or western borders, at one time or another, reaches each of I&M's wholesale customers." 365 F.2d at 183.

The recent case of Louisiana Public Service Commission v. Federal Power Commission, 359 F.2d 525 (5th Cir.1966), also sheds light upon this question. There the issue was squarely presented "whether the sales of natural gas at wholesale by a pipeline company from its integrated, interstate pipeline system are sales at wholesale in interstate commerce within the meaning of the Natural Gas Act, where such sales are made within the state where the gas is produced, for ultimate public consumption therein, but the gas so sold comes from an admixture of gas, some of which is destined for transportation to and consumption in other states." In holding that such sales came within the regulatory jurisdiction of the Federal Power Commission, the Fifth Circuit took cognizance of the opinions of the Supreme Court in gas cases holding in effect "that the mixing of intrastate gas with a substantial portion of interstate gas for pipeline transportation in one commingled stream gave the Commis-

sion jurisdiction 'at the outset over the entire transaction'." 359 F.2d at 528.

■■ Although the Commission had the burden of proving that interstate energy was involved, we do not adopt the concept that the only method of discharging such burden was by resort to tracing techniques. Logic would seem to dictate that where the utility is a member of a combination of utilities and has continuous access to an integrated pool of interstate energy, the tracing of out-of-state energy is indeed difficult, burdensome, and perhaps impossible. The Commission in the exercise of its expertise judgment pertinently observed:

"An interstate electric network is dynamic and ever changing both with respect to load and to generation source. It is an oversimplification, therefore, to talk in terms of a flow of electricity from point to point in an integrated power network of the type involved here. Instead, generation from each source in the system contributes directly or indirectly, and to an ever varying extent, to the energy present in all parts of the system which are not isolated from out-of-state energy sources. The fact that, as a matter of engineering determination, identification of either the source or destination of particular units of energy within an interstate power system such as respondent's [Arkansas] may be difficult and at times impossible does not detract from the interstate nature of the over-all operation. On the contrary the more complex and comprehensive the nature of the interstate network, the more unlikely it will be that any energy sources will be measurably identifiable. The use of tracing to disprove that a particular sale of a company which is part of an electrically integrated interstate system is in interstate commerce is a wholly unrealistic methodology which is irrelevant to present day power system technology." 34 F.P.C. at ——.

■ In summary we believe that the Commission applied the proper legal

principles and that the record, as a whole, demonstrates substantial evidence in support of the finding that interstate energy was supplied to all of Arkansas' twenty-three wholesale customers.

Arkansas also contends that none of the sales under consideration can be subject to the Commission's jurisdiction because each of them is made from "facilities used in local distribution." [7]

■ On this record the local distribution exemption is inapplicable. The Commission felt that evidence concerning the nature of the lines extending from Arkansas' substations to its twenty-three customers was irrelevant. It adhered to its position in *Indiana & Michigan,* 33 F.P.C. 739 (1965), namely, that where a company is in fact a public utility, all wholesale sales for resale in interstate commerce are subject to the provisions of Sections 205 and 206 of the Act, regardless of the facilities used.

The Seventh Circuit, in affirming the *Indiana & Michigan* case, held that the Section 201(b) exemption applies to a company's status as a public utility and not to the Commission's jurisdiction over sales in interstate commerce for resale. Arkansas' argument is also rejected by United States v. Public Utilities Commission, 345 U.S. 295, 316–317, 73 S.Ct. 706, 97 L.Ed. 1020 (1953). See also Federal Power Commission v. Southern California Edison Co. (*Colton* case), supra; Wisconsin-Michigan Power Co. v. Federal Power Commission, supra; State of Wisconsin v. Federal Power Commission, 91 U.S. App.D.C. 307, 201 F.2d 183, 185 (D.C. Cir. 1952), cert. denied, 345 U.S. 934, 73 S.Ct. 795, 97 L.Ed. 1362 (1953). Nor does Connecticut Light & Power Co. v. Federal Power Commission, supra, require a different result.[8]

We are also mindful of Justice Brennan's observation appearing in footnote 6 of his opinion in the *Colton* case, supra, that "whether facilities are used in local distribution * * * involves a question of fact to be decided by the FPC as an original matter." 376 U.S. at 210, 84 S.Ct. at 648. Although the Commission stated in this case that evidence concerning the nature of the lines was not relevant, it did make a finding on this issue and thereby complied with the teachings of the *Colton* case. Thus it held:

"* * * that facilities other than those leading directly to the connection with the customer are involved in the sale, and many of these facilities are clearly jurisdictional. Furthermore, the fact that a company may make a few direct sales off a line transmitting power to a wholesale customer does not convert the line into a local distribution facility. [Citing the *Colton* case]. In fact, 'at no point before delivery [to a wholesaler] has been completed has interstate transmission terminated,' and 'there is no ground for the position that local distribution includes any transmission occurring before the wholesaler who sells at retail is reached'." (Citing Wisconsin-Michigan Power Co. v. Federal Power Commission, supra).

■ Petitioner also raises other subsidiary issues, resolution of which is not difficult. The first relates to its contention that the state of Arkansas can constitutionally regulate the intrastate wholesale sales to its twenty-three customers, if in fact there is more than enough generation by petitioner within Arkansas to cover such sales. In view of our affirmation of the Commission's findings that each of petitioner's sales to its twenty-three customers involves

7. Section 201(b) 49 Stat. 847 (1935), 16 U.S.C. § 824(b) (1960), provides in pertinent part: "The provisions of * * * [Part II—Regulation of Companies Engaged in Interstate Commerce] shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce * * *. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction * * * over * * * facilities used in local distribution * * *."

8. As we have observed, *supra,* the Connecticut case presented the question whether the company was in fact a public utility, a question not in this case. Clearly, this is a distinguishing feature.

interstate energy, we find petitioner's contention well settled by Public Utilities Commission v. Attleboro Steam & Electric Company, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927), which held that state regulation of sales in interstate commerce constituted a direct burden on interstate commerce. Federal regulation of sales for resale under Section 201 of the Federal Power Act thus precludes concurrent state jurisdiction. United States v. Public Utilities Commission, supra. Moreover, the fact that the volume of interstate energy passing over Arkansas' transmission lines may at times be small in comparison with its intrastate generated energy is a factor which Congress has left to the discretion of the Commission in determining whether to exercise its jurisdiction. The courts will not construct a jurisdictional limitation on the amount of interstate energy involved. Connecticut Light & Power Co. v. Federal Power Commission, supra.

Lastly, petitioner argues that the Commission erred in finding that its sales to fourteen electric cooperatives are sales at wholesale for resale within the meaning of Section 201(b) of the Act. It premises this contention on the basis that the relationship between a cooperative association and its members is not that of buyer and seller but rather one of principal and agent. Irrespective of how this relationship is characterized, we find nothing in the language of Section 201 which would warrant excluding such cooperative associations and their members from the ambit of its coverage.

■ Section 201(d), 49 Stat. 847 (1935), 16 U.S.C. § 824(d) (1960), states in pertinent part that:

"The term 'sale of electric energy at wholesale' * * * means a sale of electric energy to any *person* for resale." [Emphasis added].

The definitional section of the Act, § 3(3) [9] and 3(4),[10] indicate that the term "person" was intended to have a very comprehensive meaning. The term has similarly been broadly interpreted by the courts to encompass the Commission's authority over the rates of sales to municipalities. United States v. Public Utilities Commission, supra; Wisconsin-Michigan Power Co. v. Federal Power Commission, supra. We hold the inclusion of cooperative associations within the term "person" to be a permissible administrative interpretation, and therefore reject the petitioner's argument on this point. United States v. Public Utilities Commission, supra, 345 U.S. at 314–315, 73 S.Ct. 706.

The order of the Commission is accordingly affirmed.

**9.** § 3(3), 49 Stat. 838 (1935), 16 U.S.C. § 796(3) (1960): "Corporation" means any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, or a receiver or receivers, trustee or trustees of any of the foregoing. It shall not include "municipalities" as hereinafter defined.

**10.** § 3(4), 49 Stat. 838 (1935), 16 U.S.C. § 796(4) (1960): "Person" means an individual or a corporation.