# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 27, 2006        Decided January 5, 2007

No. 05-1231

SACRAMENTO MUNICIPAL UTILITY DISTRICT,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORP., ET AL.,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Harvey L. Reiter* argued the cause for petitioner. With him on the briefs were *Glen L. Ortman*, *Dennis Lane*, *Lucy Holmes Plovnick*, and *Linda M. Nagel*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor. *Judith A. Albert*, Attorney, entered an appearance.

*Michael E. Ward*, *Anthony J. Ivancovich*, *Daniel J.*

*Shonkwiler*, *Mark D. Patrizio*, and *Stuart K. Gardiner* were on the brief for intervenors California Independent System Operator Corporation, et al. in support of respondent.

Before: GINSBURG, *Chief Judge*, and SENTELLE and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: For the second time in as many years, petitioner, a local utility, seeks review of a Federal Energy Regulatory Commission order denying it the opportunity to continue purchasing transmission services through a contract that expired at the end of 2004. Finding petitioner's claims meritless, we deny the petition.

**I.**

Under a contract signed in 1967, Pacific Gas & Electric (PG&E) and several other California utilities provided petitioner, the Sacramento Municipal Utility District (SMUD), long-term firm transmission service. For those uninitiated in the intricacies of energy regulation, "[f]irm service permits customers to demand transmission at any time, while non-firm service permits the utility to cut service when there is not enough excess capacity." *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 730 (D.C. Cir. 2000) (per curiam). The contract permitted SMUD to demand 200 megawatts of transmission service—at any time for a fixed rate—over a series of high-voltage transmission facilities known as the Pacific Intertie. Consisting of two 500 kilovolt lines running from the Pacific Northwest through California, the Intertie allows California utilities to purchase power from sources in Oregon and Washington. Critical to the issue before us, PG&E had a similar contract with the Western Area Power

Administration (Western).  The SMUD and Western contracts (like other PG&E firm service contracts relating to the Intertie) expired on December 31, 2004.

As we explained in *Sacramento Municipal Utility District v. FERC*, 428 F.3d 294 (D.C. Cir. 2005) (hereinafter *Sacramento I*), while Western and SMUD were receiving service under these contracts, the state of California and FERC "radically restructur[ed]" California's energy market. *Id.* at 296.  As part of the restructuring, FERC "required utilities to 'unbundle' their electricity generation and transmission services and to file new 'open access' tariffs . . . guaranteeing non-discriminatory access to their transmission facilities by competing generators." *Id.* at 295-96; *see also Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, F.E.R.C. Stats & Regs. ¶ 31,036 at 31,634-38 (1996) (summarizing FERC's new regulation).  At the same time, California created the California Independent System Operator Corporation (CAISO), a non-profit organization that took over operation (but not ownership) of many transmission facilities, including the portions of the Pacific Intertie owned by PG&E.  A year later (in a proceeding in which SMUD intervened) FERC approved a new tariff proposed by CAISO, under which CAISO no longer offers long-term firm transmission service, but instead requires utility customers to request transmission capacity in "real time," i.e., on either an hour-ahead or day-ahead basis. *See Sacramento I*, 428 F.3d at 297 (explaining CAISO tariff); *Pac. Gas & Elec. Co.*, 81 F.E.R.C. ¶ 61,122 at 61,435 (1997) (hereinafter *CAISO II*) (approving CAISO tariff).  Utilities are then charged an access fee, as well as a "congestion price" that fluctuates with demand.  The CAISO tariff provides transmission service to any utilities willing to pay the congestion charge. *Sacramento I*, 428 F.3d at 297.

Recognizing that CAISO's new service model represented a significant change for the utilities, "the Commission . . . declined to abrogate existing contracts and ordered customers to take service under the [CAISO] tariff upon contract expiration." *Id.*; *see also CAISO II,* 81 F.E.R.C. at 61,470-71. For this reason, SMUD and Western continued receiving transmission service under the 1967 contracts until they expired at the end of 2004. In addition to delaying implementation of the open-access tariff for these utilities, FERC required CAISO to find ways to allow utilities to hedge the risk of price fluctuations, *Pac. Gas & Elec. Co.*, 80 F.E.R.C. ¶ 61,128 at 61,427 (1997) (hereinafter *CAISO I*), and later adopted a CAISO proposal that mitigated risk through the use of short-term tradeable financial instruments, *see Cal. Ind. Sys. Operator Corp.*, 87 F.E.R.C. ¶ 61,143, at 61,569-82 (1999). At oral argument in this case, FERC's counsel indicated the Commission is now investigating longer-term risk mitigation strategies through a comprehensive market redesign proceeding. Oral Arg. at 24:30.

Early in 2004, PG&E filed for permission to terminate transmission service to SMUD and Western upon the expiration of their contracts at the end of that year. Shortly thereafter, PG&E and CAISO began negotiations with Western—but not with SMUD—to continue transmission service outside the CAISO tariff. Unlike SMUD, Western owns and operates a segment of one of the two transmission lines that make up the Pacific Intertie. PG&E owns and CAISO operates the remainder of this line. Absent an agreement similar to Western's 1967 contract with PG&E, utility customers receiving power transmitted along the Intertie would be charged twice, once by CAISO and again by Western (a phenomenon FERC calls "pancaked rates"). *Pac. Gas & Elec. Co.*, 109 F.E.R.C. ¶ 61,255 at 62,213 (2004) (hereinafter Initial Order). Western, CAISO, and PG&E, however, negotiated a "Transmission Exchange

Agreement," whereby the parties agreed to exchange transmission without charging each other transmission rates, including congestion charges. This Agreement effectively shielded Western from the risks of congestion pricing under the CAISO tariff in exchange for providing CAISO and its customers rate-free capacity on Western's portion of the Pacific Intertie. Calling the Transmission Exchange Agreement a "unique agreement which is beneficial to all the parties," FERC approved it, along with PG&E's termination of service to Western under the 1967 contract. *Id.* at 62,212-13.

Although SMUD lodged no objection to the Transmission Exchange Agreement, it opposed PG&E's filing to terminate its own service, alleging that termination would harm the public interest by subjecting SMUD to the financial risks of congestion pricing under the CAISO tariff. SMUD also asserted that PG&E's refusal to negotiate a successor agreement similar to the new Western agreement was discriminatory. Based on these arguments, SMUD urged FERC to reject PG&E's filing, or in the alternative, to suspend termination until the Commission could conduct an evidentiary hearing to resolve the issues.

FERC rejected SMUD's arguments, denied its request for an evidentiary hearing, and accepted PG&E's notice of termination. *Id.* at 62,215. SMUD sought rehearing, reiterating its arguments and asserting that FERC should have reviewed PG&E's termination request under a "public interest" rather than a "just and reasonable" standard. FERC denied rehearing, *Pac. Gas & Elec. Co.*, 111 F.E.R.C. ¶ 61,175 at 61,849 (2005) (hereinafter Rehearing Order), and SMUD now petitions for review, *see* 16 U.S.C. § 825*l*(b) (granting judicial review of FERC orders made under the Federal Power Act).

## II.

Because termination of transmission service constitutes a rate change requiring FERC approval under section 205(d) of the Federal Power Act (FPA), 16 U.S.C. § 824d(d), a transmission service provider must file with FERC before terminating service, even if service is provided under a contract ending on its own terms. *See also* 18 C.F.R. § 35.15(a). SMUD first argues that FERC may accept a filing requesting termination of service only if the termination serves the "public interest." SMUD roots this contention in dictum from *Pennsylvania Water & Power Co. v. Federal Power Commission*, 343 U.S. 414 (1952), in which the Supreme Court held that FERC's predecessor agency, the Federal Power Commission (FPC), had statutory authority to order Penn Water to continue its practice of integrating its power output with that of another public utility. *Id.* at 422-23. The Court explained that Penn Water could nonetheless seek Commission approval to discontinue service under FPA section 205(d), "provided Penn Water can prove that its wishes are consistent with the *public interest*." *Id.* (emphasis added). SMUD also points to two previous FERC orders, in which the Commission stated that "proposed termination[s] must be shown to be consistent with the public interest." *Fla. Power & Light Co.*, 3 F.E.R.C. ¶ 61,081 at 61,231 (1978); *see also Pub. Serv. Co. of Ind.*, 10 F.E.R.C. ¶ 61,277 at 61,537 (1980). According to SMUD, by refusing to make a public interest determination, FERC departed from these precedents without explanation.

We see no merit in SMUD's argument. The words "public interest" appear nowhere in section 205(d). Instead, the statute requires FERC to determine whether a proposed change in service is "just and reasonable" and free from "any undue preference or advantage." 16 U.S.C. § 824d(a), (b). Nothing in *Penn Water*, moreover, suggests that in using the term "public

interest" the Supreme Court intended to expand the scope of the Commission's inquiry beyond these statutory criteria. Nor, as FERC indicated in its rehearing order, has the Commission ever defined the scope of its inquiry differently. *See* Rehearing Order at 61,851 (referring to cases cited by SMUD in support of its position, "[i]n these cases, the Commission determined that it should make a just and reasonable determination"); *El Paso Elec. Co.*, 107 F.E.R.C. ¶ 61,314 at 62,475 (2004) ("[T]he notice of cancellation has not been shown to be just and reasonable, and may be unjust, unreasonable, unduly discriminatory, or preferential, or otherwise unlawful."); *Cinergy Servs., Inc.*, 93 F.E.R.C. ¶ 61,308 at 62,059 (2000) (stating that standard for approving notice of termination is whether termination "is not unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful"). To be sure, in *Public Service Co. of Indiana*, FERC did use the term "public interest." In that case, however, it equated "public interest" with a showing that a termination filing is "unjust, unreasonable, unduly discriminatory, preferential, or otherwise unlawful," 10 F.E.R.C. at 61,537, all terms clearly derived from the section 205(d) criteria.

In only one case, *Florida Power & Light*, has FERC defined its termination inquiry in terms that differ from section 205(d)'s criteria. 3 F.E.R.C. at 61,231. As FERC made clear in its rehearing order in this case, however, *Florida Power & Light* is distinguishable, as it involved a contractual dispute over whether a utility had agreed to a termination clause, not, as here, a filing for termination of service on a contract ending on its own terms. Rehearing Order at 61,851. Much like *Penn Water*, *Florida Power & Light*, after resolving the disputed issues in the case, merely adds that even without the contract's termination provision, the service provider retains the option of filing a motion to terminate its service under 18 C.F.R. § 35.15, and broadly states that the requested termination "must be shown to

be in the public interest." 3 F.E.R.C. at 61,231. Nowhere in *Florida Power & Light* did FERC suggest that it had authority to consider factors not found in the statute.

Alternatively, SMUD argues that even if FERC may confine its review to whether termination of service was just, reasonable, and non-discriminatory, the Commission failed to make a "just and reasonable" finding here. We see no merit in this argument either. Although FERC never said in so many words that PG&E's termination of service would be just and reasonable, it essentially used that standard in responding to SMUD's claims. *See* Rehearing Order at 61,852. In our view, this satisfies FERC's responsibilities under section 205(d).

## III.

SMUD's two substantive complaints about FERC's order, each of which it insists required a hearing, fall under two different subsections of FPA section 205(d). SMUD first contends that termination of its transmission service under the 1967 contract was not in the "public interest"—or to use the proper standard from the statute, not just and reasonable—because service termination would subject the company to greater risks of price fluctuation under the CAISO tariff. *See* 16 U.S.C. § 824d(a) (requiring rates to be "just and reasonable"). Second, SMUD claims that PG&E's and CAISO's negotiation of a successor agreement with Western, but not with SMUD, amounted to undue discrimination. *See* 16 U.S.C. § 824d(b) (requiring rates to be free from "undue preference" or "unreasonable difference[s]"). We consider each claim in turn.

In support of its first argument, SMUD contends that FERC failed to consider evidence that it would be "unable to secure firm delivery of power it has purchased under long-term firm

supply" pursuant to the CAISO tariff. Pet'r's Br. at 28. The CAISO tariff, however, does not deny transmission service to the company. Under CAISO's open-access tariff, SMUD can always access the power it purchased through long-term supply contracts, though it may have to pay congestion pricing to do so. Therefore, as FERC correctly recognized, the company is not challenging PG&E's termination of its service, but instead is again collaterally attacking the adequacy of the service provided under the CAISO tariff. *See* Pet'r's Br. at 25-27; Initial Order at 62,215 (stating that Commission had already determined in *Sacramento I* litigation that "while SMUD would take service under the rates, terms and conditions of the CAISO Tariff, it would not be denied access to transmission service"); Rehearing Order at 61,852 ("SMUD is not being denied access to the transmission system, it is merely required to access it in the same manner as other CAISO customers.").

We rejected such a collateral attack in *Sacramento I* and do so again here. *Sacramento I*, 428 F.3d at 298-99 ("[SMUD] ultimately challenges the validity of the [CAISO] tariff itself, arguing that its system of congestion pricing and firm transmission rights . . . fails to provide a service that is as good or superior to that under the Order No. 888 *pro forma* tariff . . . . [T]he time for seeking judicial review [of the CAISO tariff] has long since passed."). FERC acknowledges the significant financial risks of congestion pricing, *CAISO I*, 80 F.E.R.C. at 61,427, and is now addressing these concerns through a comprehensive market redesign proceeding, *see* Rehearing Order at 61,852. It is in those proceedings in which SMUD should raise its concerns about congestion pricing. The fact that CAISO's tariff may be imperfect for SMUD's needs gives us no authority to overturn FERC's perfectly rational decision that SMUD must, in the meantime, operate under the same tariff and incur the same risks as other California utilities.

In support of its second claim—that termination of service under the 1967 contract was discriminatory—SMUD points out that although PG&E, along with CAISO, negotiated a successor agreement with Western, it rebuffed SMUD's requests to negotiate a similar successor agreement. In order for PG&E's refusal to negotiate a successor agreement with SMUD to constitute undue discrimination, SMUD must demonstrate it is similarly situated to Western. *See Ohio Power Co. v. FERC*, 744 F.2d 162, 165 n.3 (D.C. Cir. 1984) (summarily rejecting claim where parties were not similarly situated). According to SMUD, it is so situated because PG&E proposed to terminate both its and Western's 1967 transmission contracts. In support, SMUD submitted an affidavit from Brian Jobson, a SMUD employee responsible for administering the company's transmission contracts, who explained that SMUD, like Western, offered to exchange some transmission capacity with PG&E and CAISO. Jobson Aff. at 4. Because SMUD was "not in a position to swap transmission capacity of [the] magnitude" proposed in the Transmission Exchange Agreement, the company proposed to compensate PG&E for firm transmission through a more limited transmission exchange as well as "monetarily . . . as it has since 1967." *Id.* Relying on this affidavit, SMUD argues that its proposal raised a genuine issue of fact requiring FERC to have conducted a hearing regarding whether SMUD and Western were similarly situated.

In rejecting SMUD's request for a hearing, FERC explained that Western and SMUD were not similarly situated because SMUD, unlike Western, owns no portion of the Intertie and thus "cannot offer a similar capacity exchange between California and the Pacific Northwest markets." Rehearing Order at 61,852. Not only does SMUD fail to challenge FERC's conclusion, but the Jobson affidavit fully supports it, acknowledging the company's inability to swap transmission capacity at anywhere near the same magnitude as Western. Jobson Aff. at 4.

According to Jobson, SMUD offered 100 megawatts of transmission service to CAISO. *See* Jobson Aff. at 5. By comparison, under the Transmission Exchange Agreement, Western will provide CAISO with twelve times that amount. Initial Order at 62,212. Moreover, SMUD made no showing that even the limited transmission capacity it offered would benefit other market participants—a factor FERC found crucial when approving Western's Transmission Exchange Agreement. *Id.* at 62,212-13, 62,215.

Implicitly acknowledging its inability to offer a transmission capacity exchange comparable to Western's, SMUD principally argues that FERC's decision conflicts with agency precedent, namely *Mid-Continent Area Power Pool*, 58 F.P.C. 2622 (1977), *aff'd sub nom. Cent. Iowa Power Coop., Inc. v. FERC*, 606 F.2d 1156 (D.C. Cir. 1979). *Mid-Continent* involved a pooling arrangement that allowed utilities to exchange power on a short-term basis in order to stagger generator construction—a practice called "reserve sharing." 606 F.2d at 1160-61. The arrangement created two classes of participants, with power companies having less transmission capacity receiving fewer services and less representation on pool committees. *Id.* at 1170. The FPC, FERC's predecessor, held that the two-class system amounted to undue discrimination, reasoning that, so long as the small generators provided either monetary or in-kind compensation for the transmission services they received, these utilities must be allowed to participate fully in the pooling arrangement. *Id.* at 1170 & n.46. From *Mid-Continent*, SMUD extrapolates the proposition that "it [is] discriminatory to deny a transmission service to a party based on its inability to offer an in-kind exchange, so long as it is willing to compensate the provider for the service monetarily." Pet'r's Br. at 32. Applying that principle to this case, SMUD asserts that FERC improperly considered the company's inability to provide service over the Intertie. SMUD also alleges that FERC

acted arbitrarily by failing even to acknowledge its *Mid-Continent*–based argument.

Although agencies act arbitrarily when they depart from precedent without explanation, *see Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."), FERC departed from precedent in this case only if *Mid-Continent*, as SMUD insists, actually stands for the proposition that distinguishing between in-kind and monetary contributions is *always* discriminatory. *See Interstate Quality Servs. v. R.R. Ret. Bd.*, 83 F.3d 1463, 1465 (D.C. Cir. 1996) (rejecting claim that decision must be remanded to agency where cited precedents were inapplicable). *Mid-Continent* stands for no such principle. In *Mid-Continent*, the Commission found the agreement discriminatory because the distinction between in-kind and monetary compensation was not "*reasonably related* to the . . . objectives" of the challenged agreement. 58 F.P.C. at 2635 (emphasis added). In affirming, we reiterated that "the Commission held that exclusion of small generator systems was not *reasonably related* to [the agreement's] objectives." *Cent. Iowa Power*, 606 F.2d at 1172 (emphasis added). In this case, SMUD does not argue, nor could it, that the ability to provide transmission capacity bears no reasonable relationship to the exchange of capacity in the Transmission Exchange Agreement. Indeed, exchange of transmission capacity is the very purpose of the agreement.

Furthermore, while FERC did fail to cite *Mid-Continent*, it responded to SMUD's *Mid-Continent*–based argument, explaining in the rehearing order that while SMUD "argues that the Commission has held that the lack of transmission facilities to exchange in kind should not foreclose a utility from access to transmission service, this is not relevant . . . . SMUD is not

being denied access to the transmission system, it is merely required to access it in the same manner as other CAISO customers." Rehearing Order at 61,852. As we see it, then, FERC distinguished *Mid-Continent* on the grounds that it found discrimination in that case precisely because small generators were "denied access" to services under the pooling arrangement for reasons not "reasonably related" to the purposes of the arrangement. *See Mid-Continent*, 58 F.P.C. at 2635. SMUD faces no similar denial of transmission service. Under CAISO's open-access tariff, SMUD may request as much transmission service as it needs, provided it pays the congestion charges. While FERC could have done a better job of explaining how it distinguished *Mid-Continent*, "[w]e may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears." *Bush-Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997).

For the foregoing reasons, FERC's orders are neither arbitrary nor capricious. *See, e.g., Constellation Energy Commodities Group v. FERC*, 457 F.3d 14, 19 (D.C. Cir. 2006) ("As always, we will set aside a decision of the Commission only if it is arbitrary and capricious or otherwise contrary to law."). As FERC explained, SMUD was not similarly situated to Western because, unlike Western, it owned no portion of the Intertie. FERC also adequately distinguished the principle SMUD gleans from *Mid-Continent*. Here, unlike in *Mid-Continent*, the distinction FERC drew between in-kind and monetary contributions was reasonably related to the goals of the challenged agreement. Finally, because SMUD's own affidavit acknowledges the company's inability to offer an exchange comparable to Western's, we see no abuse of discretion in FERC's decision to resolve this issue on the written record without an evidentiary hearing. *See Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993) ("[E]ven where there are . .

. disputed issues, FERC need not conduct . . . a hearing if they may be adequately resolved on the written record.").

**IV.**

While SMUD obviously prefers firm service to CAISO's congestion pricing scheme, it may not collaterally attack the CAISO tariff in this proceeding. We deny its petition for review.

*So ordered.*