# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 12, 2012          Decided June 14, 2013

No. 11-1201

NRG POWER MARKETING, LLC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

Consolidated Edison Company of New York, Inc., et al.,
Intervenors

On Petition for Review of Orders of
the Federal Energy Regulatory Commission

*Robert C. Fallon* argued the cause for petitioners. With him on the briefs were *Nathan E. Endrud, Christopher O'Hara*, and *Abraham Silverman*. *Brian M. Meloy* entered an appearance.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Robert H. Solomon*, Solicitor.

*Paul M. Flynn* argued the cause for intervenors. With him on the brief were *Barry Stewart Spector*, *William Fielding Young*, *Tamara L. Linde*, *Richard L. Roberts*, *Neil H. Butterklee*, and *Donald Joseph Stauber*. *Kenneth R. Carretta* entered an appearance.

Before: TATEL, *Circuit Judge*, SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: In September 2010, the Federal Energy Regulatory Commission ("FERC") approved a settlement between PJM Interconnection, L.L.C. ("PJM"), the New York Independent System Operator, Inc. ("NYISO"), Consolidated Edison Company of New York, Inc. ("ConEd"), Public Service Electric & Gas Company ("PSE&G"), PSE&G Energy Resources & Trading L.L.C., and the New Jersey Board of Public Utilities. *Order Approving Contested Settlement and Denying Rehearing*, 132 FERC ¶ 61,221 (2010). This settlement ended protracted litigation over how to transition transmission service agreements entered into during the 1970s to the open access regime FERC created for transmission lines in its Order No. 888. Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21,540 (May 10, 1996) ("Order No. 888"). NRG Power Marketing, L.L.C., which objected to the approved settlement, petitions for review of FERC's order

approving the contested settlement and of FERC's order granting in part and denying in part NRG's request for rehearing. *See Order on Rehearing & Motions*, 135 FERC ¶ 61,018 (2011). In the settlement proceedings and its request for rehearing, NRG objected to the settlement, which gives ConEd transmission rights not available to other market participants, arguing that it violated FERC's open-access principles as explained in Order No. 888, and that FERC's rationales to justify the settlement as just and reasonable and not unduly discriminatory were flawed and not supported by substantial evidence. For the reasons set forth below, we deny NRG's petition for review, concluding that FERC did not act arbitrarily or capriciously in approving an agreement that did not conform to PJM's open-access transmission tariff, and that FERC's justifications for approving the agreement were reasonable and supported by substantial evidence.

## I.     BACKGROUND

### A.  Statutory and Regulatory Background

Historically, electric utilities owned generation, transmission, and distribution facilities, and sold these three services as part of a "bundled" package. *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 681 (D.C. Cir. 2000). But as transmission technologies improved and alternative power suppliers emerged, a wholesale energy market developed, giving wholesale energy consumers new sources for competitively priced power. *Id.* at 681–82. Utility ownership and control of transmission lines, however, remained a barrier to the development of this market. *Id.* at 682. Recognizing that utilities that owned and controlled transmission lines had a profit-maximizing motive to restrict access to their transmission lines, FERC promulgated regulations aimed at "unbundling" transmission services from

the other services a utility offered and opening access to the transmission lines on equal terms. *Id.* Thus, under its statutory authority to remedy unduly discriminatory or preferential rates, practices, or contracts affecting public utility rates for transmission in interstate commerce, *see* 16 U.S.C. §§ 824d–e, FERC issued Orders No. 888 and 889 to "requir[e] all public utilities owning and/or controlling transmission facilities to offer non-discriminatory open access transmission service." *Transmission Access Policy Study Group*, 225 F.3d at 682 (internal citation omitted). In Order No. 888, FERC also urged utilities to consider creating Independent System Operators ("ISOs") and Regional Transmission Operators ("RTOs"), entities that control and operate all transmission services in a particular region independent of the utilities that own the transmission lines. *See Braintree Electric Light Dep't v. FERC*, 550 F.3d 6, 8 (D.C. Cir. 2008).

As part of Order No. 888, FERC required every transmission-owning public utility to file a non-discriminatory open access transmission tariff ("OATT") that was either consistent with or superior to a *pro forma* open-access transmission tariff contained in Order No. 888. *See* 61 Fed. Reg. at 21,619, 21,693–94, 21,706–17; *see also* Preventing Undue Discrimination and Preference in Transmission Service, 72 Fed. Reg. 12,266 (Mar. 15, 2007) ("Order 890") (amending the *pro forma* open access transmission tariff implemented by Order No. 888). The *pro forma* open access transmission tariff contains the minimum terms and conditions for non-discriminatory transmission service, and every transmission-owning public utility must abide by the tariff in providing transmission services to itself and others. *Transmission Access Policy Study Group*, 225 F.3d at 727. Although FERC did not abrogate existing contracts in Order No. 888, it noted that any new service taken upon expiration

would be considered new service and governed by the relevant open access transmission tariff. *Sacramento Municipal Utility District v. FERC*, 428 F.3d 294, 296 n.4 (D.C. Cir. 2005) (citing Order No. 888).

Of relevance to this case, § 2.2 of the *pro forma* tariff addresses transmission service agreements that pre-dated the issuance of Order No. 888. *See* 61 Fed. Reg. at 21,709. Entities taking new service after expiration of their firm transmission service contract would be entitled to the right provided under § 2.2, entitled "Reservation Priority For Existing Firm Service Customers," which provides:

> Existing firm service customers (wholesale requirements and transmission-only, with a contract term of one-year or more), have the right to continue to take transmission service from the Transmission Provider when the contract expires, rolls over or is renewed. This transmission reservation priority is independent of whether the existing customer continues to purchase capacity and energy from the Transmission Provider or elects to purchase capacity and energy from another supplier. If at the end of the contract term, the Transmission Provider's Transmission System cannot accommodate all of the requests for transmission service the existing firm service customer must agree to accept a contract term at least equal to a competing request by any new Eligible Customer and to pay the current just and reasonable rate, as approved by the Commission, for such service. This transmission reservation priority for existing firm service customers is an ongoing right that may be exercised at the end of all firm contract terms of one-year or longer.

*Id.*

## B. Factual and Procedural Background

In the 1960s and 1970s, ConEd, an electric utility that primarily serves New York City, negotiated with PSE&G, a New Jersey utility, to jointly address the supply problems of northern New Jersey and New York City. This eventually led to two separate transmission service agreements ("TSAs") between ConEd and PSE&G. ConEd and PSE&G executed the first of these agreements in 1975, which provided that ConEd would supply 400 MW from one of its upstate New York generators to PSE&G's customers in northern New Jersey, while PSE&G would supply 400 MW from one of its New Jersey generators to ConEd's customers in New York City. The second agreement was executed in 1978 and provided for a similar exchange in which ConEd would provide 600 MW from one of its upstate generators to PSE&G's territory in New Jersey, while PSE&G would supply the same amount of energy from its New Jersey territory to New York City. Because of these agreements, ConEd discontinued plans to build new transmissions facilities into New York City, and ConEd and PSE&G agreed to construct or modify facilities to effectuate the TSAs. These agreements remained effective after FERC issued Order No. 888, although ConEd's transmission system became part of the New York Independent System Operator and PSE&G's transmission system became part of PJM Interconnection, a regional transmission operator whose territory includes New Jersey.

After ConEd and PSE&G ceded control of their transmission systems to NYISO and PJM, ConEd filed a complaint with FERC alleging that PSE&G, NYISO, and PJM were failing to honor the 1975 and 1978 TSAs, which

were grandfathered agreements under the *pro forma* open access transmission tariffs. After protracted litigation, the parties, per FERC's directive, filed an operating protocol governing how the 1970s TSAs would be effectuated under the open access transmission tariffs, although the parties did not agree on all terms of the protocol. *See Consolidated Edison Co. of New York v. Public Service Electric and Gas Co.*, 111 FERC ¶ 61,228, 62,040 (2005). FERC nevertheless approved that protocol. *Id.* at 62,042. The 1975 and 1978 TSAs and the then-effective operating protocol, however, were set to expire in 2012.

Because of the impending expiration date on these TSAs, PJM and ConEd entered into replacement agreements, which they styled as § 2.2 roll-over agreements, with an effective date of 2012. In April 2008, PJM filed two non-conforming open access transmission tariff roll-over agreements with FERC to replace the two respective 1970s TSAs (collectively, the opinion will refer to these new agreements as "the 2008 TSAs"), along with a new Schedule to the protocol. A day later NYISO filed a joint operating agreement protocol ("JOA protocol") on an informational basis with FERC.

In August 2008, FERC accepted and suspended the 2008 TSAs and JOA protocol. It also set the matter for hearing and suspended the hearing to give the parties the opportunity to engage in settlement discussions before a settlement judge, and directed NYISO to formally file the 2008 JOA protocol. After extensive negotiations, the parties filed a settlement in which they modified the 2008 TSAs and JOA protocol and agreed that service under the 2008 TSAs would be rolled over under § 2.2 of PJM's open access transmission tariff. The JOA protocol that FERC ultimately approved allows ConEd to submit contract elections in NYISO's day-ahead market for the 400 MW and 600 MW transactions, and requires NYISO

and PJM to establish flow schedules across the transmission lines entering New York City from New Jersey ("the New York City feeders").

Allowing ConEd the ability to elect 1000 MW across the New York City feeders concerned FERC's trial staff, who initially opposed the settlement. FERC's trial staff opined that the settlement would "render a substantial amount of transmission capacity unavailable for other customers, while providing preferential service to a limited number of parties," an issue that was particularly acute given the "extremely limited" transmission capacity into and out of New York City. NRG also filed comments opposing the settlement. Joint Appendix 386. Because the settlement was contested, the settlement judge certified the settlement to FERC without making a determination on the merits.

In February 2010, FERC issued an order stating that it was unable to approve the settlement because the record was inadequate for FERC to decide certain contested legal issues, and establishing a briefing schedule. Several parties filed briefs or motions for late intervention and comments, including the parties to the settlement and NRG, the New York Public Service Commission, and PJM's Market Monitor, among others. In March 2010, NRG filed a request for rehearing and for clarification of the briefing order, asserting, among other things, that the record was insufficient for a finding on the settlement.

FERC approved the contested settlement by order on September 16, 2010, noting that "the [s]ettlement is a just and reasonable means for ConEd to obtain a continuation of its grandfathered transmission service." *PJM Interconnection, L.L.C. v. Public Service Electric & Gas Co.*, 132 FERC ¶ 61,221, 62,236 (2010). In approving the settlement, FERC

made determinations on several contested issues. First, FERC determined that the 1970s TSAs were agreements for firm service, and were therefore eligible for roll-over under § 2.2 of PJM's open access transmission tariff. *Id.* at 62,239. Second, FERC determined that the unique circumstances under which the PJM and NYISO would provide the service required under the 2008 TSAs warranted non-conforming open access transmission tariff service agreements. Specifically, FERC concluded that the agreements interpreting the JOA protocol were necessary to provide reliable service to ConEd. *Id.* at 62,241. In determining that ConEd was eligible for non-conforming service, FERC concluded that ConEd was not receiving an undue preference and that no other entity would be unduly discriminated against by approving that service. *Id.* at 62,241, 62,243. FERC also determined that the 2008 TSA did not have a significant adverse effect on the rights of and prices paid by other parties, *id.* at 62,244–45, and that the 2008 TSAs did not violate any provisions of PJM's or NYISO's open access transmission tariffs. *Id.* at 62,245–46. In approving the contested settlement, FERC denied NRG's request for rehearing or clarification, explaining that all issues raised in the hearing and briefing orders had been addressed, and that the record, through briefing, was adequately developed for FERC to approve the settlement. *Id.* at 62,246.

NRG filed a request for rehearing of FERC's order approving the settlement, arguing that FERC erred in approving the settlement for several reasons, including that the 1970s TSAs were not eligible to be rolled over and that FERC's approval of the settlement was not based on substantial evidence. *See PJM Interconnection*, *L.L.C. v. Public Service Electric & Gas Co.*, 135 FERC ¶ 61,018, 61,060 (2011). FERC, in an order addressing each of NRG's arguments, largely denied NRG's request for rehearing. *Id.* at

61,066. Although it granted NRG's request to accept an affidavit it had previously filed, it explained that the affidavit did not change its determinations. *Id.*

After FERC denied rehearing, NRG timely petitioned this Court for review of these orders. First, NRG asserts that FERC's order approving the settlement is arbitrary and capricious because it conflicts with FERC's rules and precedents. This argument, essentially, is that FERC cannot approve non-conforming agreements that deviate from the relevant OATT for an individual utility. Second, NRG asserts that FERC's order was not supported by substantial evidence, and that even if FERC based its decision on an adequate record, its determination that the approved settlement was not unduly discriminatory did not reflect reasoned decision-making.

## II.    ANALYSIS

When reviewing FERC's approval of a contested settlement, we must determine whether FERC has supplied a "reasoned decision" that is supported by "substantial evidence." *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1162 (D.C. Cir. 1998) (quoting 18 C.F.R. § 385.602(h)(1)(i)). If FERC's approval is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence," *id.* § 706(2)(E), we must set aside its approval of the contested settlement. *Exxon Co. v. FERC*, 182 F.3d 30, 37 (D.C. Cir. 1999). In reviewing FERC's approval of the settlement, we note that "when agency orders involve complex scientific or technical questions," as is the case here, "we are particularly reluctant to interfere with the agency's reasoned judgments." *B&J Oil & Gas v. FERC*, 353 F.3d 71, 76 (D.C. Cir. 2004).

## A. Approval of Non-Conforming OATT Filings

NRG's first challenge to FERC's approval of the settlement is that the settlement is inconsistent with FERC's open access orders, our precedents, and § 2.2 of the *pro forma* OATT itself. As NRG conceded at oral argument, this challenge is essentially that FERC can only approve roll-over service under § 2.2 that conforms to the relevant OATT. Stated differently, as NRG did in its Request for Rehearing of FERC's order approving the settlement, NRG argues that "[p]recedent dictates that a transmission provider cannot rollover a non-conforming agreement." Joint Appendix 791. We disagree, and conclude that FERC's approval of the contested settlement, and its rationale for rejecting NRG's arguments, was not a departure from its orders, precedents, or terms of § 2.2 of PJM's OATT, particularly in light of the substantial deference we give to FERC in interpreting its own orders. *See Consumers Energy Co. v. FERC*, 428 F.3d 1065, 1067–68 (D.C. Cir. 2005).

NRG is correct that Order No. 888 requires that an entity rolling over service under § 2.2 must take that service under the terms of the applicable OATT. Indeed, FERC itself noted this fact, explaining in its order approving the settlement that "[t]he roll-over provisions of Order No. 888 and 890 do not provide a right for a service other than OATT service," 132 FERC at 62,241, and stating in its order denying rehearing that it "agree[s] with NRG that section 2.2 of the *pro forma* OATT does not provide a right for service other than OATT service." 135 FERC at 61,062. And in its order approving the settlement, FERC explains that "the 2008 1000 MW TSA will be subject to PJM's OATT." 132 FERC at 61,241.

Notwithstanding FERC's acknowledgement that ConEd's service must be taken under the terms of PJM's OATT, FERC nevertheless approved a settlement that included elements—specifically, the JOA protocol—that do not conform to PJM's OATT. *See id.* FERC's rationale in approving these elements was that the JOA protocol was necessary "to enable PJM and NYISO to manage [unintended loop flows]" and "to provide for a continuation of" reliable service. *Id.* NRG takes issue with FERC's approval of the JOA protocol, asserting that FERC contravened its open access principles by approving a non-conforming agreement that gives ConEd rights that are not available to other market participants.

In response to this contention, FERC explained in the order approving the settlement that "OATT services can be conforming or non-conforming," and determined that the JOA protocol is necessary "due to the operational issues raised by the service that cannot be accommodated under standard OATT service," explaining that the terms and conditions of the settlement order "reflect the needs of [PJM and NYISO] in order to be able to provide service to ConEd." 135 FERC at 61,062–63. Intervenor PJM further elaborated on the operational difficulties present in this case, an explanation we find helpful in deciding whether FERC's interpretation of Order No. 888 is reasonable. According to PJM, the operational challenge in transitioning the 2008 TSAs to PJM's OATT is that, under the TSAs, energy originates in New York in NYISO's territory, transmits across New Jersey through PJM's territory, and is then delivered to New York City in NYISO's territory. Intervenor Br. at 13. PJM explains that because of how it provides its "through-and-out" service, it would not be able to provide service when the "source" and "sink" of the energy occurred within NYISO. *Id.* at 13–15; *see also* 132 FERC at 62,243 (explaining that "the service PJM provides to ConEd differs from typical through-and-out

service because the source and sink are in the same system (i.e., New York)"). PJM explains that this operational challenge was at the core of the litigation that underlay the settlement agreement, and that FERC's order on the second phase of that litigation—which sets out guidance on the terms to be included in a protocol to ensure that service under the 2008 TSAs was effectuated consistent with open access principles—formed the basis for the JOA protocol that FERC eventually approved as part of the settlement agreement. Intervenor Br. at 14–17; *see Initial Decision on Phase II Issues*, 103 FERC ¶ 63,047 (2003) (Presiding Judge's Decision on Phase II issues), *aff'd in part and modified in part*, *Opinion and Order on Initial Decision*, 108 FERC ¶ 61,120 (2004) (FERC's order on review of Presiding Judge's Phase II Decision).

Instead of acknowledging this operational difficulty, NRG argues, in absolute terms, that FERC cannot approve the rollover of non-conforming OATT agreements, explaining that FERC's open access orders "provide that, upon expiration of a customer's grandfathered, pre-open access transmission contract, the customer's service going forward will be governed by an applicable non-discriminatory OATT." Pet'r Br. at 25. NRG contends that because the 2008 TSAs do not conform to PJM's OATT, they contravene FERC's open access principles, and FERC's order approving the settlement must be vacated. NRG supports this argument by citing to our opinion in *Transmission Access Policy Study Group*, in which we noted that open access is the "essence" of Order No. 888 and explained that under Order No. 888 "utilities must . . . provide access to their transmission lines to anyone purchasing or selling electricity in the interstate market on the same terms and conditions as they use their own lines." 225 F.3d at 681.

But while NRG asserts, in broad terms, that open access is a fundamental "tenet" or "principle" of Order No. 888, it has not persuasively cited a specific provision of Order No. 888 or any language in § 2.2 of the *pro forma* OATT that prevents FERC from approving *any* rolled-over transmission service agreement filings that deviate from the OATT. Nor has NRG cited any FERC precedent in which FERC stated that the rollover of non-conforming transmission service agreements—even those that grant rights to one market participant that are not given to others—*per se* violate its open access orders.

To the contrary, FERC has approved agreements in the past that allow deviations from filed OATTs. In *PJM Interconnection*, *L.L.C. & Carolina Power & Light Co.*, 134 FERC ¶ 61,048 (2011), FERC approved a Joint Operating Agreement between neighboring RTOs, finding that "the Joint Operating Agreement provides for a superior method of congestion management" compared to the OATT. *Id.* at 61,198. And in *Midwest Independent Transmission System Operator*, *Inc. & PJM Interconnection L.L.C.*, 106 FERC ¶ 61,251 (2004), FERC explained that when limited available transfer capability existed on a system between RTOs, RTOs could, if explicitly stated in a service agreement, limit § 2.2 rollover rights for long-term service. *Id.* at 61,898; *see also Order on Clarification Denying Rehearing*, 109 FERC ¶ 61,166, 61,803 (2004) (explaining that a Joint Operating Agreement between RTOs to allocate capacity did not violate Order No. 888, even if a customer would "not have access to the total of the available . . . capacity under one RTO's OATT").[1]

---

[1] In addition to these two orders, FERC, both in its order denying rehearing and in its Respondent Brief before us, cited four other orders in which it approved non-conforming agreements. *See* 135

Although NRG acknowledges that these orders "did approve tariffs with non-conforming provisions," Pet'r Reply Br. at 12, it argues that the Joint Operating Agreements at issue in these cases did not grant a preference to any individual entity, unlike the 2008 TSAs and JOA protocol approved here. And, NRG notes, FERC's precedent places a high burden on a transmission provider seeking FERC's acceptance of a non-conforming agreement "to justify and explain that any non-conforming aspects of the agreement are 'consistent with or superior to' the relevant *pro forma* agreement." Pet'r Reply Br. at 13 (quoting *Southwest Power Pool*, *Inc.*, 132 FERC ¶ 61,159, 61,807 (2010)).

We agree with NRG that these orders are not directly on point but do not find this dispositive of whether FERC can approve a non-conforming agreement between PJM and NYISO to effectuate the 2008 TSAs to ConEd, particularly given the operational challenges presented. NRG addresses neither the operational challenges that exist in providing

---

FERC at 61,062; Resp't Br. at 26–27. These agreements, however, were non-conforming generator interconnection agreements, which are covered by FERC's Order No. 2003. *See Southern California Edison Co.*, 133 FERC ¶ 61,200, 62,001 (2010). Order No. 2003 expressly states that FERC may approve non-conforming generator interconnection agreements "where reliability concerns, novel legal issues, or other unique factors would call for non-conforming agreements," *id.* at 62,001–02, while neither Order No. 888 nor subsequent orders clarifying FERC's open access policies explicitly state that FERC may approve non-conforming agreements. Thus, we agree with NRG that these four orders approving non-conforming generator interconnection agreements do not persuasively demonstrate that FERC may approve agreements that do not conform to the relevant OATT. But the fact that Order No. 888 does not include such an express provision does not preclude FERC from approving non-conforming agreements in Order No. 888, for the reasons we explain in the body of this opinion.

service to ConEd through two independent transmission operators, nor the fact that FERC has recognized the necessity of non-conforming agreements for a small number of individuals "with specific reliability concerns, novel legal issues, or other unique factors." *Southwest Power Pool*, *Inc.*, 132 FERC at 61,807. As we have stated before, when entities before FERC present "intensely practical difficulties" that demand a solution, FERC "must be given the latitude to balance the competing considerations and decide on the best resolution." *Blumenthal v. FERC*, 552 F.3d 875, 885 (D.C. Cir. 2009). Given the operational difficulties in effectuating the rolled-over service through two neighboring transmission operators, we do not read FERC's orders so strictly as to deny FERC discretion to approve transmission service agreements that do not completely conform with the relevant OATT.

NRG also attempts to demonstrate inconsistency by citing FERC's orders regarding the Sacramento Municipal Utility District, orders that we affirmed in *Sacramento Municipal Utility District v. FERC*, 428 F.3d 294 (D.C. Cir. 2005) ("*SMUD I*"), and in *Sacramento Municipal Utility District v. FERC*, 474 F.3d 797 (D.C. Cir. 2007) ("*SMUD II*"). In *SMUD I*, we upheld FERC's determination that under the California Independent System Operator's ("CAISO") tariff, which did not include a section equivalent to § 2.2 of the *pro forma* tariff, a municipal customer could not extend the terms of its contract or invoke the right of first refusal under Order No. 888. 428 F.3d at 297. In *SMUD II*, we upheld FERC's determination that CAISO and other California utilities did not unduly discriminate when they negotiated with the Western Area Power Administration to continue transmission service outside the CAISO tariff while at the same time requiring the municipality to take service under CAISO's tariff. 474 F.3d at 804. Because Western owned and operated a segment of a transmission line that

made up the Pacific Intertie, FERC had approved the transmission agreement as a "unique agreement which is beneficial to all the parties," and we determined that it was not unduly discriminatory for FERC to do so because the municipality did not own any portion of the Intertie. *Id.* at 799, 804 (quoting *Pacific Gas & Electric Co.*, 109 FERC ¶ 61,255, 62,212–13).

The key distinction between FERC's orders in the *SMUD* cases and its order approving the settlement in this case is that, in this case, FERC expressly approved the transmission service agreement agreed on by the parties to the settlement, even though that agreement included elements that did not conform to PJM's OATT. In contrast, FERC had not approved a similar agreement in *SMUD I*, but had only determined that the municipality had not argued any basis for extending its expired grandfathered transmission contract under CAISO's tariff. No inconsistency exists between denying an entity the ability to extend its grandfathered transmission service and approving a new transmission service agreement, taken under the relevant OATT, which includes a protocol that does not conform to the relevant OATT. This is particularly true when the relevant OATT includes a roll-over provision that was not present in CAISO's tariff, and when providing the rolled-over service involves operational challenges that were not evident in the case of the municipality in *SMUD I* and *II*. Although NRG's argument would have more weight had FERC rejected a non-conforming agreement between the municipality and CAISO as violating Order No. 888's open-access principles, such was not the case in the *SMUD* orders, leaving NRG's argument as simply a challenge to FERC's ability to approve any transmission service agreement that does not conform to the relevant OATT. Moreover, the fact that FERC approved the transmission exchange agreement in *SMUD II* based on

unique circumstances demonstrates that it has exercised discretion in the past to approve transmission agreements that do not conform to the relevant OATT.

Finally, NRG argues that it is illogical for FERC to approve a non-conforming agreement for roll-over service under § 2.2, because § 2.2 of PJM's OATT does not provide a right to any service other than OATT service. Pet'r Br. at 35–38. But as FERC explained in its order denying rehearing, "ConEd will schedule the service in accordance with the PJM OATT and will pay all of the charges prescribed by the OATT for such service." 135 FERC at 61,062. FERC's interpretation of § 2.2 as not preventing it from approving non-conforming service is plausible, and we thus do not disturb FERC's approval of the settlement on this ground, particularly because we afford FERC substantial deference in its interpretation of its own orders. *Consumers Energy Co.*, 428 F.3d at 1067–68. FERC's interpretation of Order No. 888 as not foreclosing nonconforming transmission service agreements is not "plainly erroneous or inconsistent" with its open access orders or, as NRG argues, with § 2.2 of the *pro forma* OATT. *See id.* at 1067. We therefore defer to FERC's interpretation of its orders as allowing the non-conforming 2008 TSAs and JOA protocol it approved in this case.

Of course, our conclusion that FERC has discretion to approve a transmission service agreement that does not conform to the applicable OATT does not excuse FERC from making the required determinations under §§ 205 and 206 of the Federal Power Act that the agreements are just and reasonable and not unduly discriminatory, a determination that FERC must base on substantial evidence. *See* 16 U.S.C. §§ 824d–e; *id.* § 825*l*(b). Having concluded that FERC did not act arbitrarily or capriciously by the mere fact that it approved a non-conforming agreement, we now turn to

NRG's contentions that the approved settlement is unduly discriminatory and that FERC did not base its determination on substantial evidence.

## B. Undue Discrimination

In its petition for review, NRG argues that FERC failed to demonstrate that its orders are not unduly discriminatory. FERC asserts, however, that NRG waived its undue discrimination argument because it did not raise the issue in its request for hearing, as it was required to do under § 313 of the Federal Power Act. *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the [reviewing] court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). We have explained that § 313 is construed strictly, and that "objections not explicitly presented in proceedings below, but arguably 'implicit' in other objections, were not properly preserved." *Entergy Services*, *Inc. v. FERC*, 391 F.3d 1240, 1247 (D.C. Cir. 2004) (citing *Kelley ex rel. Mich. Dep't of Nat'l Resources v. FERC*, 96 F.3d 1482, 1488 (D.C. Cir. 1996)).

When FERC approved the settlement agreement, it addressed whether the 2008 TSAs and JOA protocol unduly discriminated against other market participants. *See* 132 FERC at 62,241–44. Responding to NRG's arguments that the JOA protocol was unduly discriminatory "because it would carve up scarce transmission resources without allowing open access to competitors" and because it gives ConEd unique congestion rights not available to other competitors, FERC determined that the agreement was not unduly discriminatory because no other entities were similarly

situated, *i.e.*, requesting service where the source and sink were in NYISO.  *Id.* at 62,242.

Although FERC's order clearly addressed this issue under a subheading entitled "undue discrimination," NRG's request for rehearing does not directly raise the issue of undue discrimination.  Instead, NRG takes issue with the factual findings that underlie FERC's determination that the agreement was not unduly discriminatory, arguing that FERC "erred in asserting that other parties are free to take the same service as ConEd,"  explaining that FERC's assertion was incorrect because "the JOA is tailored to meet the specific needs of ConEd."  Joint Appendix 817.

In its reply brief, NRG asserts that it properly preserved its undue discrimination argument in its request for rehearing, citing to sections in which it "object[ed] to the manner in which the JOA Protocol discriminates against all market participants other than ConEd by not allowing them to schedule counterflows across the NYC feeders," and in which it argued "that the JOA Protocol creates 'undue harm' to pricing in NYISO and PJM and that [FERC] wrongly discounted the material impact of such harms to NRG."  Pet'r Reply Br. at 20.  NRG also cites pages in its request for rehearing in which it uses variations on the words "discriminatory" and "preferential."  *Id.*

We agree with NRG that it has properly raised these issues in its petition for review.  While it is true that NRG did not explicitly include a subheading for "Undue Discrimination" in its request for rehearing, as it has in its petition for review, the substance of its arguments in both filings is sufficiently similar to preserve its objection before us.  NRG argues undue discrimination in its petition for review based on: (a) the fact that "[t]he 2008 1000 MW TSAs

and JOA Protocol are discriminatory in operation because they give ConEd a unique and preferential ability to schedule physical power flows across the NYC Feeders," while all other market participants are required to schedule flows between PJM and NYISO across the "generic PJM-NYISO proxy bus," Pet'r Br. at 43 (internal quotation marks omitted); and, (b) the harm to NRG's operations resulting from economically inefficient flows and the harm to the PJM and NYISO markets resulting from price distortions created by the settlement. *See id.* at 44–46, 48–50. NRG asserted these same points in its request for rehearing, and its request for rehearing thus "gave notice to the Commission with sufficient clarity regarding the grounds on which it urged reconsideration." *Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 683 (D.C. Cir. 1978) (applying the Natural Gas Act's judicial review provision, which is worded identically to that of the Federal Power Act).

Although we conclude that NRG has preserved the undue discrimination argument it advances in its petition for review, we reject that argument on its merits. We agree with FERC that "NRG's claim of injury is not that it seeks the particular service which ConEd is getting," Resp't Br. at 33, but instead that the settlement agreement reduces NRG's access to the transmission lines and harms its operations. We similarly conclude that the undue discrimination claim NRG raises is, in reality, simply a challenge to FERC's reasoning in finding the settlement agreement just and reasonable, and to the sufficiency of the evidence upon which FERC relied. As with its argument that FERC cannot approve non-conforming agreements, NRG's failure to address the operational challenges involved in effectuating the 2008 TSAs is fatal to its undue discrimination claim. To prevail on an undue discrimination challenge, NRG must demonstrate that it and ConEd are similarly situated for purposes of the approved

settlement. *See Ohio Power Co. v. FERC*, 744 F.2d 162, 165 n.3 (D.C. Cir. 1984). NRG has not demonstrated that it or any other parties are similarly situated to ConEd and does not argue in its petition for review that any other entities aside from ConEd have requested through-and-out service that sources and sinks in the same area. Accordingly, we conclude that FERC did not unduly discriminate against NRG by approving the settlement agreement.

## C. Substantial Evidence

Finally, we address NRG's challenges to FERC's reasoning and the sufficiency of the evidence upon which it based its decision. NRG first argues that FERC's procedural history—the timing of its issuance of orders establishing hearings and briefing schedules—demonstrates that the record was insufficient. NRG also contends that FERC's determinations on several factual issues that led to FERC's approval of the settlement were not based on substantial evidence. In addition to its argument that FERC did not base its decision on substantial evidence, NRG asserts different reasons why FERC's decision to approve the settlement was arbitrary and capricious. We find these arguments unpersuasive, and conclude that FERC's order was well-reasoned and supported by substantial evidence.

The procedural history does not demonstrate that FERC arbitrarily reversed course on whether the post-settlement record was insufficient, as NRG claims. After PJM and ConEd filed the 2008 TSAs and JOA protocol, which resulted from the litigation generated by ConEd's initial 2002 complaint, FERC issued an order on August 26, 2008, establishing a trial-type evidentiary hearing and settlement procedures on the justness and reasonableness of the TSAs. *See PJM Interconnection L.L.C. & New York Independent*

*System Operator*, *Inc.*, 124 FERC ¶ 61,184 (2008). In that order, FERC explained that the issues raised in protest to those TSAs raised questions of material fact that could not be resolved on the record before FERC at that time, and that FERC could not determine whether the TSAs and JOA protocol may be unjust, unreasonable, or unduly discriminatory. *See id.* at 61,912. The hearing was never held, and the settlement FERC ultimately approved was filed on February 23, 2009. *See PJM Interconnection L.L.C. & New York Independent System Operator, Inc.*, 130 FERC ¶ 61,126 (2010). But before FERC approved the settlement, it issued an order establishing briefing schedules on February 19, 2010, stating that it found the state of the record at the time of that order insufficient to allow it to resolve the merits of some of the contested issues. *Id.* at 61,623.

Nowhere in the order establishing a briefing schedule did FERC state that the factual record was insufficient. Indeed, FERC acknowledged the settlement had resolved some of the issues, including factual issues, that had motivated the order FERC issued in 2008 establishing a hearing. *Id.* at 61,626. FERC noted that it was establishing a briefing schedule because these issues appeared to raise legal, rather than factual issues, and reserved for itself "the right to establish additional procedures including hearing procedures if necessary." *Id.* That FERC received the briefing it requested and made determinations on contested issues, without gathering additional evidence or invoking its reserved right to establish a hearing, does not demonstrate, by itself, that FERC "reversed course on the sufficiency of the record." Pet'r Br. at 41. Moreover, FERC's decision not to hold an evidentiary hearing is within its discretion, and it may "properly deny an evidentiary hearing if the issues, even disputed issues, may be adequately resolved on the written record, at least where there is no issue of motive, intent or credibility." *Pacific Gas &*

*Electric Co. v. FERC*, 306 F.3d 1112, 1119 (D.C. Cir. 2002). NRG has not alleged that issues of motivation, intent, or credibility were present in the approval of the settlement, and we therefore do not find a procedural flaw in FERC's decision to approve the settlement based on the record as it existed at that time.

We now turn to NRG's substantive challenges to the sufficiency of the evidence upon which FERC relied in approving the settlement, noting that "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Murray Energy Corp. v. FERC*, 629 F.3d 231, 235 (D.C. Cir. 2011) (quoting *Colorado Interstate Gas v. FERC*, 599 F.3d 698, 704 (D.C. Cir. 2010)). In its request for rehearing, NRG argued that approving the settlement agreement would impermissibly distort prices in NYISO's energy market, and that FERC did not adequately explain how the 2008 TSAs and JOA protocol could be just and reasonable in light of this distortion. NRG emphasized the harm to its own operations resulting from the settlement, maintaining that FERC unreasonably discounted the loss NRG would incur from even a small percentage of inefficient power flows. NRG also asserted that FERC's reference to other pending proceedings that may address the NYISO-PJM seams issues did not make FERC's determination on the settlement agreement's impact on prices reasoned decisionmaking, explaining that ConEd's preferential agreements would still exist and that FERC was legally bound to address problematic elements in the instant settlement proceedings.

FERC responded that the 2008 TSAs were economic in roughly 88 percent of hours, and that the harm caused by the remaining 12 percent did not outweigh the benefits the settlement conferred, particularly because the settlement

provided substantially lower prices to customers in New York in 88 percent of hours. 135 FERC at 61,063–64. Noting that "the perfect cannot be the enemy of the good," FERC explained that until the RTOs addressed loop flow issues, the settlement provided a reasonable method of managing loop flows and providing overall benefits to customers. *Id.* at 61,064.

In its petition for review, NRG first argues that FERC weighed the justness and reasonableness of the settlement against the wrong baseline, asserting that FERC should have measured the justness and reasonableness of the settlement against the alternative of requiring all market participants, including ConEd, to take under conforming OATTs. This argument, however, is merely a collateral attack on FERC's ability to approve non-conforming agreements, and again ignores the operational difficulties that prompted the underlying litigation and settlement in the first place.

Neither are we persuaded by NRG's argument that FERC did not engage in a reasoned analysis in weighing the harms and benefits of approving the settlement. NRG cites to FERC's explanation in its order denying rehearing where FERC explained that the settlement would improve flows in 88 percent of hours, which NRG claims was not based on any evidence in the record. NRG explains that ConEd's expert merely testified that prices in New York City were higher 88 percent of the time than prices in New Jersey, and that the evidence attached to this expert's affidavit actually demonstrated that, even absent the settlement, power would flow economically in 25 percent of those hours.

Even if we were to accept that FERC's statement that flows would "improve" in 88 percent of hours was an "exaggeration"—when FERC had previously stated that

"[b]oth the parties supporting the Settlement and NRG generally agree that the 2008 1000 MW TSAs are economic in roughly 88 percent of hours," *see* 132 FERC at 62,241—this exaggeration does not render FERC's reasoning arbitrary or capricious. *See* Pet'r Br. at 48. FERC's order approving the settlement explained that the agreements were economic in 88 percent of hours, and that "when prices are lower in NYISO than PJM, the price differential usually is not great, but, when prices in NYISO are higher than PJM, they are substantially higher," 132 FERC at 62,244, factors FERC relied on to approve the settlement. And in its order denying rehearing, FERC determined that the harm to NRG's facility did not outweigh "the fact that the agreement results in substantially lower prices to customers in New York in 88 percent of hours," a factual finding that NRG has not attempted to dispute in its petition for review. 135 FERC at 61,064. Thus, apart from attempting to cast FERC's statement about improving flows as an unreasonable exaggeration, NRG essentially requests us to review FERC's balancing of competing interests. But as we have explained, we properly defer to policy determinations invoking FERC's expertise in evaluating complex market conditions. *Tennessee Gas Pipeline Co. v. FERC*, 400 F.3d 23, 27 (D.C. Cir. 2005). In this case, "FERC reflected on the competing interests at stake to explain why it struck the balance it did," and we will not reject its determination. *Sacramento Municipal Utility District v. FERC*, 616 F.3d 520, 541–42 (D.C. Cir. 2010).

When discussing the impact of the settlement on prices, FERC noted that other proceedings were already underway to address issues at the NYISO-PJM seam. *See* 132 FERC at 62,245 ("NRG asserts that the JOA Protocol prevents economic power flows across the PJM-NYISO seam . . . [, but] we find that any problems with the PJM-NYISO seam,

including use of the single proxy bus for pricing, are beyond the scope of this proceeding.").  In its petition for review, NRG maintains that FERC's attempt to kick the can down the road violates our precedent and fails to adequately respond to NRG's and another objecting party's argument that the settlement would interfere with a comprehensive resolution of the seams issue.  NRG cites our opinions in *NorAm Gas Transmission Co.*, 148 F.3d 1158, and *SMUD II* to support this argument, and also asserts that FERC "did not adequately grapple with NRG's and DTE's arguments that approving the Settlement Agreement may interfere with the establishment of a comprehensive non-discriminatory solution to the seams issues." Pet'r Br. at 57.

We disagree with NRG that FERC did not "adequately grapple" with NRG's and DTE's arguments.  In its order denying rehearing, FERC explained that the results of the seams issues addressed in other proceedings would affect the settlement, stating that neither the 2008 1000 MW TSAs nor the JOA protocol would prevent PJM and NYISO from modifying their OATTs once the seams issues are resolved, and that if PJM amends its scheduling practice, that new practice would govern ConEd's transmission service agreement.  135 FERC at 61,065 n.62.  NRG responds that this explanation is dismissive of it and DTE's arguments, because it only pointed to the possibility that PJM and NYISO would amend their OATTs in a way that affected the service to be provided under the settlement.  But FERC was not being dismissive of these arguments; instead, it was balancing different problems in the face of uncertainty.  Indeed, DTE's statement is itself uncertain regarding the effects of the settlement, with DTE expressing concern that the settlement "*may* interfere with NYISO's and PJM's ability to establish a comprehensive interface pricing policy between the two regions."  Joint Appendix 787 (emphasis added).  Given the

complexities in this case—both the operational difficulties in effectuating ConEd's rolled-over service across two RTOs and the coordination issues between the two RTOs more generally—we conclude that FERC has appropriately considered the issues the petitioner and other entities raised during the settlement approval process, and defer to FERC in its decision on how to resolve these competing issues. That the settlement is not what petitioners or other entities in the market would have wanted does not undermine FERC's approval of it. *See Public Service Commission of Wisconsin v. FERC*, 545 F.3d 1058, 1067 (D.C. Cir. 2008).

NRG also has not persuaded us that our precedent forecloses FERC from citing the ongoing PJM-NYISO seams issue proceedings to justify its approval of the settlement. In *SMUD II*, we determined FERC acted reasonably in deciding that a municipality raising concerns over implementation of an OATT should participate in proceedings to redesign the tariff, rather than grandfather its pre-open access transmission service agreement. On this issue—whether FERC may refer to ongoing proceedings related to a contested settlement in order to justify that settlement—*SMUD II* is unpersuasive for the same reasons it failed to persuade on the issue of whether FERC can approve non-conforming agreements. In the *SMUD* cases, the municipality requested that we vacate and remand FERC's order approving the termination of its long-term transmission contract. *SMUD II*, 474 F.3d at 800. We upheld FERC's acceptance of the termination of the contract, explaining that its decision that the municipality must operate under the tariff during a comprehensive marketing redesign proceeding was "perfectly rational." *Id.* at 802. The distinction between the *SMUD* cases and the settlement here is that FERC approved the non-conforming agreement, which still requires ConEd to take under the rates of PJM's OATT. Thus, we do not read *SMUD I* and *II* as stating that FERC

may never approve a non-conforming agreement when broader ongoing proceedings exist. Balancing an immediate short-term need to approve an agreement to address operational difficulties with broader market redesign proceedings to address pricing issues is the sort of challenge that requires a high level of technical expertise, and we properly defer to FERC's informed discretion on that score. *Transmission Access Policy Study Group*, 225 F.3d at 714.

We also fail to see how *NorAm* precludes FERC from citing other ongoing proceedings when approving this settlement. In *NorAm*, FERC had stated that the contested settlement proceedings in that case were not the appropriate forum to address one of the issues the petitioner had raised before this Court. 148 F.3d at 1163. We never spoke to whether FERC was incorrect in stating that the contested settlement proceedings were not the proper forum for all issues related to the petitioners challenge, but instead explained that because the goal of FERC's natural gas pipeline open access orders was to remedy anticompetitive behavior by pipeline sellers, "it was incumbent upon [FERC], when considering the settlement offer, to give serious consideration to the alleged anticompetitive effects of Tennessee's rate system." *Id.* at 1164.

In this case, FERC seriously considered the anticompetitive effects of the settlement, determining that the settlement was justified in light of the unique operational challenges involved in effectuating the 2008 TSAs. In fact, the approach FERC used in approving the contested settlement is one of the four approaches that FERC established in *Trailblazer Pipeline Co.*, 85 FERC ¶ 61,345 (1998), which FERC issued in part as a response to our reversing it in *NorAm*. *See id.* at 62,340–41. Under the first approach explained in *Trailblazer*, FERC may, assuming an

adequate record, address each objection of a contesting party on the merits. *Id.* at 62,342. If it finds that all the contesting parties' objections lack merit, FERC may approve the settlement. *Id.* FERC adopted that approach here, *see* 132 FERC at 62,236 n.37, and addressed each of NRG's objections in its order approving the settlement. Though NRG, unsurprisingly, disagrees with FERC's determinations on the merits, we conclude that FERC was not dismissive of NRG's objections when it discussed separate proceedings addressing the NYISO-PJM seam, but was instead explaining its decision in light of complex market conditions. We owe this evaluation deference. *See Tennessee Gas Pipeline*, 400 F.3d at 27.

NRG also cites *NorAm* to argue that FERC's finding that the settlement agreement was "freely negotiated" is insignificant. Pet'r Br. at 53. But this case is unlike *NorAm* or the other cases that motivated FERC to establish a contested settlement approval process. In those cases, we reversed FERC's orders approving a settlement because FERC had relied on the consent of the settling parties without independently concluding that the settlement was just and reasonable or in the public interest. *See NorAm*, 148 F.3d at 1164–65; *Laclede Gas Co. v. FERC*, 997 F.2d 936, 946 (D.C. Cir. 1993); *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1003 (D.C. Cir. 1990). We also observed that though FERC must independently conclude a settlement is just and reasonable, and cannot ignore arguments raised by a competitor just on the basis of widespread support for the settlement, FERC "is clearly entitled to give weight to the support of customers when deciding whether to approve a settlement offer." *NorAm*, 148 F.3d at 1165. In its order approving the settlement in this case, FERC has addressed each argument raised by NRG, and has not relied solely on the fact that the settlement was "freely negotiated" to determine that the

settlement was just and reasonable.  Thus, FERC's mention of the fact that the settlement was freely negotiated does not render its decision unreasonable.

Finally, NRG's request for rehearing asserted that FERC's determination that the JOA protocol was needed to ensure reliability contradicts FERC's earlier orders in the underlying litigation, in which FERC explained that ConEd's dependence on the 1000 MW flows across the New York City feeders was "more an economic consideration than a reliability consideration."  *See Consolidated Edison Co. of New York*, *Inc. v. Public Service Electric & Gas Co.*, 120 FERC ¶ 61,161, 61,702 (2007).  NRG maintained that even if FERC had changed its position on whether economic or reliability benefits underlay its decision to approve the order, the evidentiary record was based on conjecture by ConEd's experts and unsupported by objective engineering data.  Moreover, NRG contended that FERC failed to weigh the conflicting evidence offered by NRG's expert, who stated that the settlement would decrease reliability.

FERC, in its order denying rehearing, explained that the previous orders were consistent with FERC's order approving the settlement because FERC's statements on economics versus reliability were, in proper context, responding to ConEd's arguments in the underlying litigation.  135 FERC at 61,064.  FERC also explained that "economics and reliability are not mutually exclusive," and that the record upon which FERC approved the settlement included statements from the New York Commission and the City of New York explaining that the agreements provided critical reliability benefits.  *Id.* Even excluding reliability, FERC had several reasons for approving the settlement that would have been sufficient even absent reliability concerns.  *See id.*

In its petition for review, NRG essentially restates the arguments from its request for rehearing on the reliability issue. We conclude, however, that FERC adequately addressed NRG's challenge to its consideration of reliability. Although NRG claims that FERC attempts to "obfuscate the [reliability] issue by stating that 'economics and reliability are not mutually exclusive,'" Pet'r Br. at 51, FERC has, in the very order NRG cited in its attempt to create inconsistency, considered both factors together. *See* 120 FERC at 61,701 ("The Commission stated that while reliability was one of the purposes of the two contracts, economic considerations were more important . . . ."). The issue on which FERC denied rehearing in that order was whether it "correctly gave the proper weight to reliability considerations"; not to whether FERC could consider reliability at all. *Id.* at 61,702. Moreover, we agree with FERC's statement in rehearing that it had other reasons that were sufficient to approve the settlement apart from reliability considerations. *See* 135 FERC at 61,064 ("The order addresses the important issues regarding the right to roll-over firm agreements, the need for the non-conforming JOA Protocol to do so, the fact that this exchange agreement reduced the need for additional transmission construction, and the lower prices produced in 88 percent of the hours. These rationales would be sufficient to permit a rollover regardless of any reliability benefits."). We therefore conclude that FERC's discussion of reliability benefits does not render its order arbitrary or capricious, or otherwise provide a basis for granting NRG's petition.

## III.    CONCLUSION

For the foregoing reasons, we hold that FERC's approval of the contested settlement and denial of NRG's request for rehearing was based on substantial evidence and was neither

arbitrary nor capricious.    Accordingly, NRG's petition for review is denied.

*So ordered.*